UNITED STATES of America, Plaintiff,

v.

Robert CIAMPITTI, Albrecht and Heun Corporation, Bruce N. Ciampitti and Pacific Four Corporation, Defendants.

Civ. A. No. 83–4004.

United States District Court,
D. New Jersey.

April 2, 1984.

Samuel P. Moulthrop, Asst. U.S. Atty., Jodi Lee Alper, Sp. Asst. U.S. Atty., Newark, N.J., for plaintiff.

Alfred A. Porro, Jr., Lyndhurst, N.J., for defendants, Robert Ciampitti, Bruce N. Ciampitti and Pacific Four Corp.

James A. Waldron, Rubin & Waldron, Wildwood, N.J., for defendant, Albrecht and Heun Corp.

## OPINION

GERRY, District Judge.

This matter is before the court on the Government's request for a preliminary injunction. It wants to prevent the defendants from engaging in fill activities at the Diamond Beach site in Cape May County, New Jersey, which the Government contends contains federally regulated wetlands.

The Government is proceeding under the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* [hereinafter "Clean Water Act"] and the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403 [hereinafter "Rivers and Harbors Act"] and § 407 [hereinafter "Refuse Act"].

A hearing was held on November 9, 15 and 17, 1983. The court had previously issued a temporary restraining order on October 24, 1983 barring defendants from any further fill activities on the site until the matter could be heard.

The following constitutes this court's findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. *The Defendants and Their Relationship to the Diamond Beach Site*

Robert Ciampitti is an individual residing within the District of New Jersey. [Robert Ciampitti Deposition (hereinafter R.C. Dep.), p. 4; Tr. 3, p. 24.] He and Pacific Four Corporation [hereinafter "Pacific Four"], a corporation organized and existing under the laws of Pennsylvania and doing business within the District of New Jersey, are the developers of the site. [R.C. Dep., pp. 11–13.]

Bruce Nicholas Ciampitti, Robert's brother and the largest single owner of parcels of land at the site, gave Robert a power of agency for all land at the site in the name of Bruce Nicholas. [R.C. Dep., pp. 59, 110; Tr. 3, pp. 60–61, 82.] [Bruce Ciampitti holds title to the land under the name Bruce Nicholas. R.C. Dep., p. 30.]

In addition, Robert Ciampitti was designated agent and representative for Pacific Four and all individual lot owners at the site to secure all necessary approvals to install improvements at the site. [R.C. Dep., pp. 12, 71, 74; Tr. 3, pp. 45, 80, 81.] Those individuals are paying Robert Ciampitti for his efforts on their behalf, [R.C. Dep., p. 76]; and in some instances, Ciampitti has directed and paid for filling activities at the site himself, hoping later "to strike a deal" with the actual property owners. [R.C. Dep., p. 91; William Albrecht Deposition (hereinafter W.A. Dep.) pp. 19, 24.]

In light of Robert Ciampitti's activities at the site, the parties stipulated on the record that he is the principal defendant—the one

responsible for having conducted the activities at the site. [Tr. 1, p. 29.] For that reason, in the remainder of this opinion, the court shall refer only to the "defendant," rather than to the "defendants," when discussing activities at the site.

Albrecht and Heun Corporation is the construction company responsible for placing and grading fill on the site under the direction of Robert Ciampitti. [R.C. Dep., pp. 144, 151; W.A. Dep., pp. 19, 24.] Robert Ciampitti also contracted with Gerald E. Speitel Associates, a consulting engineering firm [hereinafter "Speitel"], to work for him. [Tr. 3, p. 137.]

### B. *Activities at the Site*

As early as 1980, Robert Ciampitti was made aware of federal wetlands regulations by his consultants, Speitel. He was aware that in certain areas along navigable waterways, the U.S. Army Corps of Engineers [hereinafter "the Corps"], had jurisdiction over those areas through their regulations. [R.C. Dep., pp. 60–62; Tr. 1, pp. 103, 105; Tr. 3, pp. 100, 113–137, 160–161.]

Specifically, he was told by Speitel that there was possible state and federal jurisdiction over wetlands on the site. The Corps, which was summoned to the site by Gary Franklin, a Speitel employee, told Speitel that a federal permit to fill that area was unlikely. Despite those warnings, Ciampitti directed Speitel to develop engineering plans for the site and told Speitel that he would possibly be filling wetland areas. [Tr. 1, pp. 103–105; Tr. 3, pp. 100, 113, 137, 147–149, 160–161.]

Robert Ciampitti did nothing between 1980 and 1983 to contact the Corps about its jurisdiction over the site. He assumed that if the Corps had jurisdiction, it would so advise him. [R.C. Dep., pp. 72–73; Tr. 3, pp. 100–101.] Furthermore, he did not apply to the Corps for a wetlands permit, because in March 1983, he became aware of a 1907 land grant held by the previous owners of the site which provides:

> The bearers of the title of the property within this grant have the right to dredge, fill, reappropriate lands under water, construct wharfs, marinas, inlets, buildings, or anything that they deem appropriate to their private and exclusive use.

[R.C. Dep., pp. 102–103; Tr. 3, pp. 76, 153; Defendant's Trial Exhibit 14.]

In the summer of 1983, *after learning of this grant,* defendant decided to develop portions of the site which he was aware were designated as New Jersey wetlands and possible federal wetlands, believing that the grant gave him authority to do so. [R.C. Dep., p. 128; Tr. 3, pp. 97, 153.] In particular, he had a fifty foot pipe and a tide gate placed on the northwest corner of the site in order to keep debris from coming in and going out; to allow storm water to run off the site; and *to prevent tidal water from coming onto the site.* [R.C. Dep., pp. 115–118; Tr. 3, p. 102.]

These activities were noted by Robert E. Eckhardt from the Corps' Philadelphia District, Regulatory Branch for the Surveillance and Inspection Section, who inspected the site on September 2, 1983. [R.C. Dep., p. 138; Robert Eckhardt Affidavit (hereinafter R.E. Aff.) ¶ 7; Tr. 1, p. 35.]

He observed the following:

a. Approximately 3,000 feet of roadway had been constructed in areas he believed to be wetlands contiguous to Jarvis Sound on the site.

b. The roads were constructed of sand hauled to the site.

c. The fill consisted of sand.

d. A tide gate had been constructed in a tidal creek and stopped tidal flow into large portions of the area designated as wetlands at the site.

e. The tide gate is a type that causes wetlands to be drained of water.

f. The "wetlands" impounded by the tide gate showed signs of deterioration; e.g., vegetation was becoming dry.

g. Storm sewers and outlets had been installed in certain portions of the roads.

h. There were no soil erosion control measures at the site.

[R.E. Aff., ¶ 9; Tr. 1, pp. 40–45, 49.]

The fill material and tidal gate were placed in federally designated wetlands as depicted on Government Trial Exhibit RR–1. [R.E. Aff., ¶ 10; John Olson Affidavit (hereinafter J.O. Aff.), ¶ 6–7; Tr. 1, pp. 38–49.]

Eckhardt told Ciampitti that the site contained tidal wetlands and directed Ciampitti to cease further fill activities in those areas. [R.C. Dep., p. 139; R.E. Aff., ¶ 14; Tr. 1, pp. 50–51.] Ciampitti told Eckhardt that he would stop the fill activity, [R.E. Aff., ¶ 15], but he did not stop because he did not believe he had been properly notified by an appropriate official of the Corps. [R.C. Dep., pp. 7–24.] He subsequently directed Albrecht and Heun to continue filling in roads in the designated wetlands area. [R.C. Dep., p. 144.]

On September 13, 1983, Eckhardt returned to the site and observed approximately three dump trucks and two bulldozers hauling and spreading fill material into the designated wetlands. [R.E. Aff. ¶ 18; Tr. 1, pp. 56–57.] Eckhardt advised the bulldozer operator to stop filling in wetlands. The operator, Mr. Albrecht, made a telephone call and said he would stop work. [R.E. Aff., ¶ 19; Tr. 1, pp. 57–58.]

On September 15, 1983, the District Engineer of the Corps issued a "cease and desist" letter directing Robert Ciampitti to stop fill activities in the wetlands and remove the tide gate. [R.E. Aff., ¶ 21; Tr. 1, p. 107.] On September 16, 1983, this "cease and desist" letter was delivered by Robert Eckhardt and John Olson of the Corps to the office of James Webb, Jr., Esquire, the attorney for Robert Ciampitti. On that date, John Olson advised Webb of the location of wetlands on the site and explained to him the scope and nature of the violations there. [R.E. Aff., ¶ 22; Tr. 1, pp. 60, 64, 111; Tr. 3, p. 104.] Robert Ciampitti became aware that the cease and desist letter had been issued against him for filling federal wetlands, and that the letter had been served upon James Webb,

his attorney. [R.C. Dep., p. 146; Tr. 3, p. 104.] Nonetheless, he did not cease filling activities at the site. [Tr. 1, p. 72; Tr. 3, p. 1031.] He directed Albrecht and Heun to continue filling at the site. He did not contact the Corps and disregarded the cease and desist letter. [R.C. Dep., pp. 147–151; Tr. 3, pp. 103–106.]

On September 16, 1983, John M. Olson, Supervisory Biologist serving as the Acting Chief of the Application Section of the Philadelphia District of the Corps, inspected the site and observed that approximately five acres of earthen fill had been placed on wetlands and in tidal creeks at the site, and that a pipe with a tide gate had been installed in one tidal creek. [J.O. Aff., ¶ 6.] Olson determined during his September 16, 1983 inspection that wetlands were located on the site and based that conclusion on:

a. The presence of tidal creeks flowing into the site;

b. The presence of existing vegetation adapted for growth in saturated or innundated soils, including saltmarsh cordgrass (*Spartina alterniflora*), salt-meadow cordgrass (*S. patens*), salt grass (*Distichlis spicata*), black grass (*Juncus gerardii*), marsh elder (*Iva frutescens*), sea lavender (*Limonium carolinianum*) and saltwort (*Salicornia sp.*);

c. Saturated soil conditions; and

d. The presence of standing water over portions of the site.

[J.O. Aff., ¶ 7.]

He returned to the site on September 20, 1983 and observed bulldozers working on upland areas adjacent to the wetlands. He told the bulldozer operator which areas were wetlands and could not be filled, and which areas were uplands. [J.O. Aff., ¶ 14.]

On September 27, 1983, Robert Eckhardt received a phone call from James Webb, attorney for Robert Ciampitti, who advised Eckhardt that no one from the Corps would be permitted on the site from that date

onward. Webb also stated that the Corps could not stake out the wetlands on the site the following day, as had been previously agreed to by John Olson and James Webb, Esquire. [R.E. Aff., ¶ 24; Tr. 1, p. 120; R.C. Dep., p. 158.]

On October 13, 1983, Robert Eckhardt returned to the site and observed that, since his last visit to the site, additional fill material had been placed in the wetlands as depicted on Government Trial Exhibit RR–3. He also observed a bulldozer spreading fill on one of the roadways which had previously been constructed in the wetlands. [J.O. Aff., ¶ 25; Tr. 1, p. 70.] *See* GRR–3.

On October 20, 1983, Robert Eckhardt returned to the site and observed that, since his last visit to the site, fill material had been placed in additional areas of the wetlands as depicted on Government Trial Exhibit RR–4. He also observed a tractor-trailer dump truck discharging fill in the wetlands. [R.E. Aff., ¶ 28; Tr. 1, p. 72.] *See* GRR–4.

### C. *The Site and Its Development*

The portion of the Diamond Beach site involved in this controversy is described in Lower Township tax records simply enough as Blocks 696, 701, 706, 716, 721, 726 and 731. [Complaint ¶ 19; R.E. Aff., ¶ 12; J.O. Aff., ¶ 16; R.C. Dep., pp. 12, 71, 74; Tr. 3, p. 23.] It is a tract of land located along New Jersey Avenue, which is known as Park Boulevard in Lower Township [Tr. 2, p. 105], between West Jefferson Avenue and Madison Avenue. [Tr. 1, p. 39.] It is bounded on the West by East Railroad Avenue and Jarvis Sound.

A railroad embankment is located on the site parallel to East Railroad Avenue. [Tr. 1, pp. 45–56.] It was built in approximately 1924. [Tr. 3, pp. 113–114.] In a 1957 photo of the site, [D–1], remnants of a road running next to the railroad right-of-way can be seen. [Tr. 3, pp. 123, 67.]

Sometime prior to 1955, the southern portion of the site was used as a dumping ground. [Tr. 3, pp. 39–40.] As of 1957, mosquito ditches appeared on the property. [Tr. 3, p. 125.] Sometime between 1957

and 1962, a driving range was constructed on the site which was no longer in use as of 1969. The vegetation has grown back. [Tr. 3, pp. 126–127.]

Furthermore, the railroad was no longer used as of 1962. [Tr. 3.] Sometime between 1962 and 1969, a breach appeared in the railroad embankment. It has not been firmly established whether the breach was created as a result of a major storm that occurred in 1962 or was manmade. [Tr. 1, p. 150; Tr. 3, pp. 117, 130.]

Most important, in 1975 the federal government claimed jurisdiction over the wetlands under the Clean Water Act. In 1979 or early 1980, subsequent to the federal claim of jurisdiction, Memphis, Rochester and Richmond Avenues, and part of Park Boulevard were filled. All the evidence of record indicates that at the time of this first fill activity by the defendant the site could be characterized as wetlands and was subject to tidal flow. [*See infra* at 488–489; Tr. 2, p. 19.]

Following that, in 1982, Albrecht, at Ciampitti's direction, filled Railroad, Raleigh, Madison, South Station and Austin Avenues. [2D, p. 20.] A water well was installed by the Wildwood Utilities Authority between South Station and Raleigh, east of Park. In addition, those areas depicted on Government Exhibit RR were filled, and the tidal gate was installed. [Tr. 3, p. 74.]

Defendant plans to develop the entire Diamond Beach site to include approximately 1,500 single family dwellings, 6–8 multi-unit dwellings, a motel facility and a shopping center. [R.C. Dep., p. 132; Tr. 3, p. 83.] To date, none of the defendants has either applied for or obtained a permit under the Clean Water Act, [R.E. Aff., ¶ 31; J.O. Aff., ¶ 15]; the Rivers and Harbors Act [*id.*]; or the Refuse Act [*id.*].

### D. *The Presence of Wetlands on the Site*

On the basis of the evidence thus far presented to the court, it concludes that federally regulated wetlands exist on the Diamond Beach site as designated on

Government Trial Exhibits RR–5 and 100–102. [*See* Tr. 1, p. 130; Tr. 2, p. 101.][1]

Vegetation on the site which indicates a wetlands environment includes: marsh hay, salt marsh cordgrass, high tide bush, salt marsh fleabone, black grass and sea myrtle. [Tr. 1, p. 131; Tr. 2, p. 110; Government Trial Exhibit 8.] These plants are commonly found in New Jersey salt marshes, [Tr. 2, p. 109], and are adapted to an area subject to tidal flow. [Tr. 1, pp. 146–147.] Specifically, salt marsh grass and salt grass, two plants which survive frequent flooding, are found immediately adjacent to the tidal ditches on the site. Up from the tidal ditches, but still within the federally designated wetlands area, high tide bush, groundsel tree and sea myrtle, vegetation adapted for life in saturated soil, can be found. [Tr. 2, p. 17.]

No significant areas within the wetlands designated area do not include the species described above [Tr. 1, p. 131]; and the federally designated wetlands area is dominated by these plants. [Tr. 1, p. 132; Tr. 3, pp. 162–163.] Furthermore, these species exist beyond even the federally designated wetlands line. [Tr. 1, p. 132.]

The salt marsh snail, a salt marsh invertebrate which lives only in wetlands, has been found on the site. [Tr. 2, p. 114.] Isopods, which are characteristic of salt marshes have also been found there. [Tr. 2, p. 114.] Fish were observed in the creek on the site [Tr. 2, p. 114]; snowy egrets were observed feeding on the fish [Tr. 1, p. 123].

Great Blue Heron and the Clapper Rail (which typically nest in salt marshes and are found only in wetlands) have been observed on the site. [Tr. 2, p. 114.]

The soil in the federally designated wetlands at the site is saturated throughout, in most cases directly to the surface. [Tr. 1, pp. 132–133; Tr. 2, p. 112.] It is wet, very dark and primarily sand, which indicates an anaerobic condition. [Tr. 2, p. 134.]

At the upper edges of the federally designated wetlands boundary, the soils are also saturated and there is a high water table. [Tr. 2, p. 113.]

During normal high tide conditions, surface water covers a majority of the site: although there are areas on the site above the high tide line which are never covered by water, over 50% of the site was covered during an inspection on November 4, 1983, even with the fill present. [Tr. 1, p. 145.] It can presently be determined by examining breaches in the fill on the site and adjacent communities of the same elevation [Tr. 1, p. 154] that, without fill, tidal waters would normally flow onto the site through the entire southernmost portion and the break in the railroad embankment. [Tr. 1, pp. 141, 150–151, 154; Tr. 2, p. 24.][2]

Finally, the Diamond Beach site was mapped as a *wetlands* area by the United States Fish and Wildlife Service on its National Wetlands Inventory between 1978 and 1980. On that map, the site was designated as a mixed emergent wetland with open water. [Tr. 2, pp. 119–121; Government Trial Exhibit QQ.]

There is inconclusive evidence that the site contains wetlands which are below the mean high tide line. Although Government expert Olson and defense expert Franklin both testified that some small portion of the site is below the mean high water line [Tr. 1, pp. 157–158; Tr. 3, p. 182], Govern-

---

1. Defendant has not evaluated the site using federal wetlands criteria so he is not in a position to directly challenge the federal designation. Nonetheless, his expert, Gary Franklin of Speitel, admitted that the area designated by the New Jersey Department of Environmental Protection agency is in fact a salt water marsh. [Tr. 3, p. 186.] This area appears on the overlay Mr. Franklin produced for the court. It appears to be somewhat smaller than the federally designated wetlands area. *See* D–30.

2. There is a major tidal creek which flows through the railroad embankment south of the site below the area of fill. [Tr. 1, pp. 151–152.] Also, according to defendants' expert, there is a tidal tributary to the southeast of the site which would allow salt water to enter the site [Tr. 3, pp. 170–171]; a marsh system to the southeast which is a potential water source [Tr. 3, p. 172]; and an inlet to the site from the east which connects the site to the ocean through the Cape May Canal [Tr. 3, p. 173].

ment expert Tiner, whom the court found to be most knowledgeable in this area, refused to testify about that subject because he believed that the data necessary to make such a determination was not available. [Tr. 2, pp. 132–133.]

E. *The Importance of the Wetlands and the Damage Done Thereto by Defendants*

Tidal wetlands are used as nursing and spawning areas for a variety of forage fish and sport and commercially important fish species. [Tr. 2, p. 11; J.O. Aff., ¶ 12.]

When this site is open to tidal flow, the plant production is washed into the adjacent tidal waters where it becomes the primary food source for aquatic organisms. The organic detritus of the tidal marsh serves as the base for the estuarian web. [Tr. 2, p. 11; J.O. Aff., ¶ 10.]

Wetlands, including this site, also act as water quality purification areas. They improve water quality by trapping run-off from adjacent developed areas [Tr. 2, p. 11; J.O. Aff., ¶ 9], and they act as a buffer, shielding adjacent upland areas from storm actions. They then serve as a storage area for storm and flood waters. [Tr. 2, p. 11.]

Furthermore, wetlands, including this site, are important habitats for aquatic animals, as well as mammals and birds, including:

a. wintering, migratory and breeding waterfowl and other birds;

b. passerine bird species; and

c. fur-bearing mammals.

[Tr. 2, p. 11; J.O. Aff., ¶ 11.]

Fill on this site eliminates wetlands and reduces their productive value. Normal tidal flow is prevented, and therefore nursery and spawning grounds for aquatic organisms are not created, and the exportation of food materials into adjacent waters cannot be realized. [Tr. 2, pp. 18, 46, 105.]

The fill on the site has damaged the underlying five acres of wetland habitat. The blockage of tidal flow is adversely affecting the approximately 19 acres of wetlands enclosed within the perimeter of the fill. [J.O. Aff., ¶ 8.] Without tidal flow, vegetation on the site will change, and there will be an overall draining effect of the area. [Tr. 2, p. 147.] Furthermore, erosion at the site is already causing fill to wash into the surrounding marsh and adjacent tidal waters. [Tr. 1, p. 124; Tr. 2, p. 123.]

II. CONCLUSIONS OF LAW—THE PREREQUISITES FOR THE ISSUANCE OF A PRELIMINARY INJUNCTION AGAINST THE DEFENDANTS HAVE BEEN MET

The traditional test for determining whether a preliminary injunction should issue has been stated in numerous cases from the Court of Appeals for the Third Circuit. In *In re Arthur Treacher's Franchise Litigation*, 689 F.2d 1137, 1143 (3d Cir.1980), the court stated it as follows:

We have repeatedly held that for the District Court to grant a preliminary injunction the moving party must generally show (1) a reasonable probability of eventual success in the litigation, and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. Moreover, while the burden rests with the moving party to make these two requisite showings, the district court 'should take into account, when they are relevant (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.' *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir.1975) [Citations omitted].

*Accord, Delaware River Port Auth. v. Transamerican Trail Tr., Inc.*, 501 F.2d 917, 919–20 (3d Cir.1974); *A.L.K. Corp. v. Columbia Pictures, Inc.*, 440 F.2d 761 (3d Cir.1971); *Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc.*, 414 F.2d 506 (3d Cir.1969), *cert. denied*, 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970); *Nelson v. Miller*, 373 F.2d 474 (3d Cir. 1967).

This court must now determine whether the requirements of the test have been met in the present case.

A. *Reasonable Probability of Eventual Success in the Litigation*

### 1. *The Clean Water Act*

■ The Clean Water Act prohibits the discharge of pollutants into the waters of the United States except in compliance with other sections of the Act. The provisions of 33 U.S.C. § 1344 regulate the discharge of fill material into those waters by requiring a discharger to obtain an appropriate permit from the Corps before commencing operations.

As the court found above, none of the defendants has applied for a permit. It is also clear that "fill" material, as that term is defined in the Act, is being discharged by defendants. *See* 323.2(K). Therefore, the issue to which the parties directed their energies is whether "waters of the United States" are involved.

The term "waters of the United States" specifically includes wetlands. The regulations implementing 33 U.S.C. § 1344 provide in pertinent part:

> The term "waters of the United States" [3] means:
>
> \* \* \* \* \* \*
>
> (3) Tributaries to navigable waters of the United States, including adjacent wetlands ....
>
> \* \* \* \* \* \*
>
> (c) The term 'wetlands' means those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands

generally include swamps, marshes, bogs and similar areas.

33 C.F.R. § 323.2.

These regulations were specifically adopted pursuant to court order in *Natural Resources Defense Council v. Callaway*, 392 F.Supp. 685 (D.D.C.1975). The court there concluded that Congress intended the Clean Water Act to assert "federal jurisdiction over the Nation's waters to the maximum extent permissible under the Commerce Clause of the Constitution," and that the term "navigable waters" was not limited to the traditional tests of navigability. 1392 F.Supp. at 686. *See PFZ Properties, Inc. v. Train*, 393 F.Supp. 1370, 1381 (D.D.C.1975).

This standard of jurisdiction has been continually repeated in recent cases. *See United States v. Tilton*, 705 F.2d 429, 431 (11th Cir.1983); *United States v. Lambert*, 695 F.2d 536, 537, 538 (11th Cir.1983); *United States v. Byrd*, 609 F.2d 1204, 1209 (7th Cir.1979); *Leslie Salt Company v. Froehlke*, 578 F.2d 742, 754–55 (9th Cir. 1978); *United States v. Ashland Oil and Transportation Company*, 504 F.2d 1317, 1324–25 (6th Cir.1974).

■ The Government presented strong evidence demonstrating that the land in question presently retains and, at the time it was filled by defendants, retained all the essential characteristics of "wetlands" as they are described under the Act; i.e., it was inundated and/or saturated by water at a frequency and duration sufficient to support vegetation that typically thrives in saturated soil conditions.[4] *See* the court's Findings of Fact.

The Government has proven through two expert witnesses that the site which has been designated as federally regulated wet-

---

**3.** Although section 1344 refers to "navigable waters," that term is defined in Section 502(7) of the Act, 33 U.S.C. § 1362(7), as "waters of the United States."

**4.** Defendants challenged the criteria by which the Government would have the court decide this issue contending that in the absence of salinity tests a wetlands determination cannot be made. The court disagrees. *See Avoyelles*

*Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897 (5th Cir.1983) (three-prong test which includes type of soil, degree and frequency of inundation and saturation, type of vegetation); *Bayou Des Familles Dev. v. U.S. Corps of Engineers*, 541 F.Supp. 1025 (E.D.La.1982); and *United States v. Weisman*, 489 F.Supp. 1331, 1339 (M.D.Fla. 1980).

lands has an abundance of "obligate hydrophytes" (plants requiring a saturated environment to survive), a number of which even live beyond the designated wetlands line. The site has been proven to contain saturated soils with regular inundation. The soils were found to show evidence of an anaerobic condition, suggesting frequent water coverage. The tidal flow was graphically depicted through ground and aerial photographs showing water-filled tidal ditches and tidal creeks. Testimony from both the Government and the defendants' expert proved the movement of tidal flow from the west, south and east onto the site.

■ Under the circumstances, the Government's likelihood of success on the merits is strong. In fact, the Government has succeeded on the merits, subject, of course, to the court being persuaded otherwise by RELEVANT controverting evidence which has not already been presented but which defendants may present at the permanent injunction hearing.

The defendants have argued and continue to urge upon the court the importance of the history and development of the site to determine whether the Corps has jurisdiction over the property. Although the court is as fascinated by the history of the site as defendants' expert Mr. Franklin is, it agrees with Mr. Franklin that for purposes of the present controversy that history is of purely scientific value and is not dispositive of the legal issues before the court. [Tr. 3, pp. 165–166.]

Defendants' arguments on this point are not clearly delineated. The court perceives that defendants are making the following three arguments and will treat with them accordingly:

1. The Government would be violating the defendants' Fifth Amendment rights if it required them to remove the fill;

2. The site is not a natural wetland; i.e., it was not always a wetland, so the defendants should not be penalized for the fact that it has become one; and

3. The area became subject to tidal flow because of a manmade breach in the railroad embankment, and, therefore, it is not properly characterized as federal wetlands.

■ Defendants' first argument, which is derivatively based on *United States v. Stoeco Homes, Inc.*, 498 F.2d 597 (3d Cir. 1974), is without merit under the circumstances of this case. So long as nothing that occurred on or to the property, before that time in 1975 when the Corps claimed jurisdiction over the wetlands, destroyed the "wetland" character of the site, there is no justification for preventing the Corps from requiring the defendant to comply with the appropriate regulations on the basis of some violations of the Fifth Amendment due process or taking clause. Neither the dump's nor the driving range's presence, nor any other activity, transformed the land into irrevocably "dry" land in 1975. Therefore, this situation can be easily distinguished from the situation in *Stoeco Homes*.

*Stoeco* involved the Rivers and Harbors Act. In 1970, the Government's permit policy with respect to § 10 was changed. Previously, it had not required dredge and fill permits for work shoreward of the established legal harbor lines. The new policy required permits for such work.

Defendants had acquired a tract of land in 1951. The site had been a tidal marsh in 1927 when it was filled to a level substantially above mean high tide. *Stoeco Homes*, 498 at 610. At the time it was filled, the policy of the Secretary of the Army was not to require a permit because the site lay shoreward of the established legal harbor lines. Therefore, at the time the filling occurred, it was legal.

The court found that the Government had given its blanket consent to encroachments on the federal navigational servitude shoreward of established legal harbor lines; and that "when Stoeco purchased in 1951 what then had been *fast land* for twenty-four years, the navigational servitude had long since been surrendered." According-

ly, defendants were not required to remove the 1927 fill. Such forced removal would have raised Fifth Amendment due process and taking clauses issues.

The court noted in concluding its opinion: [T]he holding is limited, of course, to tidal marshlands which had become fast land prior to the change in policy of the Army Corps of Engineers. Any work undertaken in estuarine areas which were subject to the ebb and flow of the tide when the Army Corps of Engineers published its new regulations asserting the navigational servitude to its full extent, are, under the terms of these regulations, now subject to the § 10 permit requirement.

33 C.F.R. § 209.150(b). *Id.* at 611. The court's reasoning applies equally well to the regulations under the Clean Water Act as applied to the site. The Diamond Beach site was not fast in 1975 when the Corps published its new regulations in July of that year asserting the navigational servitude to encompass adjacent wetlands:[5] there is nothing in the record which indicates that the sources of ground water and tidal flow which saturate the site were not available in 1975, nor that the site was fast land at that time. [*See* aerial photographs of the site, the New Jersey Department of Environmental Protection designation, designation on the National Wetlands Inventory Map, Tr. 2, p. 19.] Therefore, when the defendants began the fill operations in 1983, they were subject to the permit requirements of § 1344.

■ An offshoot of defendants' first "development and history" argument is the argument that because of the railroad embankment to the west of the site, which served as a barrier for some period of time, the site was not always naturally flowed by

---

5. § 323.3 Discharges requiring permits.

(a) General. Department of the Army permits will be required for the discharge of dredged or fill material into waters of the United States. Certain discharges specified in §§ 323.4–1, 323.4–2 and 323.4–3 are permitted by this regulation. If a discharge of dredged or fill material is not permitted by this regulation, an individual or general Section 404 permit will be required for the discharge of dredged or fill material into waters of the United States in accordance with the following phased schedule:

(1) Before July 25, 1975, discharges into navigable waters of the United States.

(2) After July 25, 1975, discharges into navigable waters of the United States and adjacent wetlands.

(3) After September 1, 1976, discharges into navigable waters of the United States and their primary tributaries, including adjacent wetlands, and into natural lakes, greater than 5 acres in surface area. (*See also* § 323.4–2 for discharges that are permitted by this regulation.)

(4) After July 1, 1977, discharges into all waters of the United States. (*See also* § 323.4–2 for discharges that are permitted by this regulation.)

＊　＊　＊　＊　＊　＊

§ 323.4–1 Discharges prior to effective dates of phasing.

(a) Discharges of dredged or fill material in waters of the United States that occur before the phase-in dates specified in § 323.3(a)(2) through (4) of this part are hereby permitted for purposes of Section 404, provided the conditions in paragraph (c) of this section are met.

(b) Discharges of dredged or fill material of less than 500 cubic yards into waters other than navigable waters of the United States (*see* 33 CFR Part 329) that are part of an activity that was commenced before July 25, 1975, that were completed by January 25, 1976, and that involve a single and complete project and not a number of projects associated with a complete development plan are hereby permitted for purposes of Section 404, provided the conditions in paragraph (c) of this section are met. The term "commenced" as used herein shall be satisfied if there has been, before July 25, 1975, some discharge of dredged or fill material as a part of the above activity or an entering into of a written contractual obligation to have the dredged or fill material discharged at a designated disposal site by a contractor.

(c) For the purposes of Section 404, the following conditions must have been satisfied for the discharges occurring before the dates specified in paragraphs (a) and (b) of this section:

(1) That the discharge was not located in the proximity of a public water intake;

(2) That the discharge did not contain unacceptable levels of pathogenic organisms in areas used for recreation involving physical contact with the water;

(3) That the discharge did not occur in areas of concentrated shellfish production; and

(4) That the discharge did not destroy or endanger the critical habitat or a threatened or endangered species, as identified under the Endangered Species Act.

Both § 323.3 and § 323.4–1 have since been modified to exclude the phase-in provisions. *See* 47 FR 31810, 7/22/82.

the tide. From this they would presumably have the court conclude that the site does not fall within the Corps' jurisdiction.

First of all, as the court has just concluded, the history of the site is not relevant unless it indicates that the land was fast at the time the Corps claimed jurisdiction. As long as it was wet when the Corps extended its jurisdiction and when the fill activity began, the history of the site is irrelevant. *See United States v. Bradshaw*, 541 F.Supp. 880, 881, 883 (D.Md.1981) (only pertinent question is whether land was wetlands when filling activity took place).

Secondly, the existence of an artificial barrier, in this case a railroad embankment, which may prevent tidal flow to a site is not determinative of the limits of Corps' jurisdiction. Wetlands separated from other waters of the United States by manmade dikes or barriers, natural river burns, beach dunes and the like are specifically defined as adjacent wetlands, 33 CFR § 323.2(d), therefore making them "waters of the United States" for regulatory purposes. 33 CFR § 323.2(a)(7). *See United States v. Tilton*, 705 F.2d 429, 431 (11th Cir.1983) (even without direct or indirect surface connection between wetlands in question and adjacent river, area came under wetlands definition).

So even without the ingress and egress of tidal waters, the site could be classified as an adjacent wetlands area subject to Corps regulations. But here, the artificial barrier was breached—sometime between 1962 and 1969—and thus did not serve as a barrier to tidal flow until defendants installed the tidal gate. At least since that time, a thriving wetlands environment has been established. Furthermore, tidal waters flow onto the site from the southeast where no barrier exists,[6] and groundwaters saturate the soil.

█ Finally, with regard to defendants' third historical argument, the fact that part of the area *may* have become wetlands because of a *manmade* connection between the site and tidal waterways is not dispositive of the Corps' jurisdiction. This court finds that federal jurisdiction is determined by whether the site is presently wetlands and not by how it came to be wetlands.

The Act applies to wetlands without reference to the manner by which they came to be in that condition. *See* 33 CFR § 323.2. Furthermore, since Congress intended to exercise its jurisdiction under the Clean Water Act to the greatest extent possible in order to protect our environment, the court has no reason to believe that Congress did not intend to reach wetlands which are the habitats of fish, fowl and vegetation alike simply because those environments were, at some point in time, encouraged by human conduct.

More specifically, it was noted in the Federal Register, V. 42, No. 138, p. 37128 (1977), on the occasion of a modification of the definition of wetlands in 323.2:

The words 'those areas that are periodically inundated' which appeared in the 1975 definition of 'wetland' were eliminated in the 1977 definition because the legislative intent under Section 404 [33 U.S.C. § 1344] is to regulate discharges of dredged or fill material into the aquatic system *as it exists, and not as it may have existed over a period of time.*

(Emphasis added.)

Although there are no cases of which the court is aware dealing with this issue under the Clean Water Act, there are cases on point under the Rivers and Harbors Act. *See Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *United States v. DeFelice*, 641 F.2d 1169, 1172 (5th Cir.1981) (federal jurisdiction occurred by operation of law when an artificially created canal became connected to a tidal waterway); *United States v. Stoeco Homes, Inc.*, 498 F.2d at 611 (once

---

**6.** Defendants argue that their fill activities are exempt from Corps permit requirements under 33 CFR 323.4–2 which, when in effect, exempted certain discharges into *non-tidal* streams and their impoundments, including adjacent wetlands that are located above the headwaters. First of all, § 323.4–2 is no longer in effect and was not in effect at the time defendants initiated the impermissible activity. More important, *tidal* waters are involved in this matter.

artificial canals are connected to a tidal water body, they become navigable waters of the United States by operation of law).

While the court recognizes that a regulation under the Rivers and Harbors Act provides that "[n]avigability may also be found where artificial aids have been or may be used to make the waterbody suitable for use in navigation," 33 CFR § 329.-8,[7] the court does not believe that the existence of this regulation was determinative of the courts' decisions. And they stand for the proposition that the Government is not exceeding its power under the Commerce Clause by regulating "artificially" created navigable waters.

That estuarine system which has developed on the Diamond Beach site is no less entitled to protection and is no less valuable to our society now that it has developed than any other wetlands site.

█ In addition to arguing the history and development of the site, defendants maintain that neither the Corps nor the New Jersey Department of Environmental Protection has jurisdiction over the Diamond Beach site because of a 1907 riparian grant covering the site which allows the defendants to do whatever they want with the property, including filling it, regardless of superseding federal and state statutes and regulations contrary to the grant's provisions.

It is not clear to the court what significance the defendants attach to the 1907 grant. If he is arguing that the grant's mere existence somehow supports his contention that the site was never considered to be "wetlands," the court rejects it. The fact that the State of New Jersey in 1907 did not recognize the importance of protecting vitally important estuarine areas and allowed for the dredging and filling of such sites has no relationship whatsoever to whether those areas are or are not "wetlands" under a federal act.

Furthermore, if the defendants are making the equally groundless argument that the grant *prevents* the federal government from asserting jurisdiction over the site under the Clean Water Act, the court also rejects it.

The defendants argue in a conclusory fashion that the 1907 grant vests *absolute* property rights in the grantee and his successors. If defendants mean to argue by this that the Government may not "take" the property, their argument is premature. As defendant Ciampitti has not applied for a permit and, consequently, has not been refused a permit, no taking without just compensation claim is presently cognizable: there has been no determination that the property may not be put to the uses desired. *Avoyelles Sportsmen's League,*

---

7. § 329.8 Improved or natural conditions of the waterbody.

Determinations are not limited to the natural or original condition of the waterbody. Navigability may also be found where artificial aids have been or may be used to make the waterbody suitable for use in navigation.

(a) Existing improvements: artificial waterbodies. (1) An artificial channel may often constitute a navigable water of the United States, even though it has been privately developed and maintained, or passes through private property. The test is generally as developed above, that is, whether the waterbody is capable of use to transport interstate commerce. Canals which connect two navigable waters of the United States and which are used for commerce clearly fall within the test, and themselves become navigable. A canal open to navigable waters of the United States on only one end is itself navigable where it in fact supports interstate commerce.

A canal or other artificial waterbody that is subject to ebb and flow of the tide is also a navigable water of the United States.

(2) The artificial waterbody may be a major portion of a river or harbor area or merely a minor backwash, slip, or turning areas. (*See* § 329.12(b) of this Part.)

(3) Private ownership of the lands underlying the waterbody, or of the lands through which it runs, does not preclude a finding of navigability. Ownership does become a controlling factor if a privately constructed and operated canal is not used to transport interstate commerce nor used by the public; it is then not considered to be a navigable water of the United States. However, a private waterbody, even though not itself navigable, may so affect the navigable capacity of nearby waters as to nevertheless be subject to certain regulatory authorities.

\*　　\*　　\*　　\*　　\*　　\*

*Inc. v. Marsh,* 715 F.2d 897, 927 (5th Cir. 1983).[8]

If the defendants are arguing that the federal government may not *regulate* navigable waters of the United States under the Clean Water Act because of the 1907 New Jersey grant, they are either laboring under a serious misapprehension or disregarding very basic tenets of the United States Constitution. When a valid act of Congress is in conflict with state law, state action must give way to the federal legislation. "So long as Congress acts within an area delegated to it, the preemption of conflicting state or local action ... flow directly from the substantive source of the congressional action coupled with the supremacy clause of Article VI...." L. Tribe, *American Constitutional Law,* 376 (1978). *See Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *United States v. DeFelice,* 641 F.2d 1169 (5th Cir.1981).

█ Defendants' final assault on the Government's claim to jurisdiction over the site is based on the Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq.* [hereinafter the "Management Act"]. The defendant misunderstands the Act. Specifically, they argue that the Corps' claim under § 404 must fail because the Government has not introduced any evidence establishing that defendant has not complied with state law under the Coastal Zone Management Act, or that the Corps' requirements are no more strict than state requirements.

The Coastal Zone Management Act requires that federal exercises of jurisdiction over certain projects within a state's coastal zone must, to the fullest extent possible, be consistent with an approved state Coastal Zone Management program. 16 U.S.C.

§ 1456(c)(1). The defendants claim in essence that the Coastal Area Facility Review Act [hereinafter "CAFRA"], N.J.S.A. 13:19–1 *et seq.,* which is an approved program under the federal Management Act, preempts the federal government's jurisdiction in this case. There is nothing in the Management Act or in *Cape May Greene, Inc. v. Warren,* 698 F.2d 179 (3d Cir.1983), upon which defendants rely, which supports his theory of preemption.

A regulation promulgated by the National Oceanic and Atmospheric Administration, the federal agency charged with administering the Management Act, provides:

> When federal agency standards are more restrictive than standards or requirements contained in the state's management program, the federal agency may continue to apply its stricter standards (e.g., restrict project development or design alternatives notwithstanding permissive management program policies) ....

15 CFR § 930.39(d) (1982).

Furthermore, 16 U.S.C. § 1456(f) provides that nothing in the Management Act shall in any way affect any requirement established by the Federal Water Pollution Control Act (also known as the Clean Water Act), and that such requirements shall be incorporated in any program developed pursuant to the Management Act. Accordingly, CAFRA incorporates the Clean Water Act requirements to which defendant objects so that it is logically impossible for those requirements to be stricter than those contained in CAFRA.

More important than all of this is the fact that the Management Act does not apply to this controversy, and, therefore, any question of consistency between the

---

8. With regard to the Government's power to take the property, *see Montana v. United States,* 450 U.S. 544, 551, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493 (1981), *rehearing denied,* 452 U.S. 911, 101 S.Ct. 3042, 69 L.Ed.2d 414 *on remand,* 657 F.2d 244, *appeal after remand,* 686 F.2d 766. "The navigation servitude, which is a term used to describe the *paramount interest* of the United States in ... the navigable waters of the nation, derives from the Commerce Clause...." *United States v. Certain Parcels of Land Situated in City*

*of Valdez,* 666 F.2d 1236, 1238 (9th Cir.1982). "Once Congress determines that an action will improve or protect navigation, the Government may rely on the navigation servitude to accomplish that action. *Id.* at 1239 (citations omitted). *But see Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). The court need not address at this time whether the property falls within the navigational servitude for taking clause purposes.

federal and state action does not arise. As the Government so aptly argues:

> Section 307(c) of the CZMA is directed at three different types of activities: (1) activities conducted or supported by the Government, (2) development projects of the Government, and (3) activities by private parties authorized by a federal permit. 18 U.S.C. § 1456(c). "The first two paragraphs thus reach activities in which the federal agency is itself the principal actor, the third reaches the federally approved activities of third parties." *Secretary of the Interior v. California, supra,* [— U.S. ——, 104 S.Ct. 656] at 667 [78 L.Ed.2d 496 (1984)]. It is obvious that the filing of an injunctive suit by the United States does not fall within any of the categories.\* Rather, in the case at hand, the activity in the coastal zone is purely a private activity of defendant Robert Ciampitti. The present case simply does not involve federal activity at this time since the defendant has not yet applied for a federal wetlands permit. If the defendant were to apply for a permit, then the question of whether Section 307(c)(3) of the CZMA applies would arise. Because defendant has failed to comply with the permitting requirement of the Clean Water Act, that question is premature. For this reason, Section 307(c) of the CZMA does not apply and no consistency determination is required.

\* Even under the National Environmental Policy Act, 42 U.S.C. § 4371 *et seq.,* an environmental review statute of greater scope and application than the CZMA, civil enforcement actions, such as the present case, do not constitute federal actions. *See* 40 CFR § 1508.18(a).

The *Cape May-Greene* case upon which defendant so heavily relies is inapposite

9. The Government also maintains and the defendant admitted [Tr. 3, pp. 85–86] that CAFRA does not apply to this site. It applies to development of public facilities, including housing developments of the 25 or more lots, and there are 24 individual lot owners involved here.

10. According to the defendant, he has received approval for a permit for soil and erosion control on portions of Richmond, Rochester and Memphis Avenues from the Cape May County Soil and Conservation District. [D–16; Tr. 3, p. 71.] He has been given permission by the

because there the federal government was attempting to prevent development on a flood plain by placing a condition on a federal sewer grant for an area that had already been specifically approved for development by the state. *Id.* at 182. Just as clearly as the Act does not apply to the present situation, it applied to that situation.[9]

The fact that defendant Ciampitti has applied for and received some local permits is irrelevant.[10] Defendant continually refers to state approvals which he has received, but there is no evidence of them in the record; and defendant totally ignores the fact, for purposes of this argument, that large portions of the site were designated wetlands on the New Jersey Department of Environmental Protection's map and therefore could not be filled without state approval but were nonetheless filled without that approval.

Finally, the court finds the Supreme Court's recent decision in *Secretary of the Interior v. California,* — U.S. ——, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984), upon which defendants also rely, irrelevant to the issues before this court.

The court having found no merit to defendants' challenges to the Corps' jurisdiction under the Clean Water Act, it can only conclude the Government's high probability of success.

### 2. *The Rivers and Harbors Act and the Refuse Act*

Given the evidence of record to date, it appears that the Government has the broadest jurisdiction over the site under the Clean Water Act.[11] Since the court has

Township of Lower to construct streets, sidewalks, curbs and sewer pipes along those avenues, and his waste water treatment capacity application has been approved by the Township.

11. Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, requires a permit from the Corps for dredge and fill activities which alter "the location, course, condition, or capacity ... of any of the navigable waters of the United States." For purposes of this Act, "navigable waters of the United States" means those waters of the United States that are subject to the ebb

determined that the Government is likely to succeed on the merits of its claim under that Act, the Corps' possible jurisdiction under the Rivers and Harbors Act and the Refuse Act is not determinative of whether a preliminary injunction should issue and need not be considered at this time.

### B. *Irreparable Injury*

It is clear that the Government need not make a showing of "irreparable injury" in order to qualify for an injunction under the Rivers and Harbors Act. *Stoeco Homes*, 498 F.2d at 611. It is equally clear that such a showing is required under the Refuse Act. *Id.*

Nonetheless, this court is relying upon the Clean Water Act and is confronted with the issue of whether a showing of irreparable harm need be made under that statute.

There is no Court of Appeals for the Third Circuit case regarding the need for such a showing, and the parties implicitly invite the court to decide that issue. It is an invitation the court declines.

It is clear that the Government has made a showing of irreparable injury whether or not such a showing is required.[12] *See* Find-

ings of Fact, *infra*, at 490. And given that the spring thaw has begun, the damage will increase geometrically between the issuance of a preliminary injunction and a final hearing on the merits.

The court should grant the equitable relief sought by the United States because there is no adequate remedy at law to compensate the public for the harm caused by the disposal of fill material into tidal wetlands. Tidal marshes serve a variety of critical functions, including the storage of flood waters, nutrition for the estuarine food web, habitat for wildlife, nursery and feeding grounds for fish, and filtration of water run-off and tidal water. Only if the filling is immediately enjoined will the United States have the continuing benefit of these ecologically valuable lands.

### C. *The Possibility of Harm to Other Interested Persons*

Another factor weighed by the courts in ruling on requests for temporary and preliminary injunctive relief is the injury to the defendant or other interested parties if an injunction issues. In the present context, the only foreseeable injury to the de-

---

and flow of the tide shoreward to the mean high water mark and/or are presently used, or have been used in the past, or may be susceptible to use to transport interstate or foreign commerce. 33 CFR § 322.2. Those marsh areas which are covered by waters of a navigable water, here Jarvis Sound, at mean high tide are navigable waters of the United States even though they are not navigable in fact. *United States v. Cannon*, 363 F.Supp. 1045, 1050 (D.Del.1973); *United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 610 (3d Cir.), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1974). The evidence presented to the court regarding those portions of the site below the mean high tide line would at best support a finding that small areas fall below that line.

Under the Refuse Act, federal jurisdiction is, at a minimum, commensurate with jurisdiction under the Rivers and Harbors Act. *Stoeco Homes*, 498 F.2d at 611. And it has even been extended to non-navigable waters where refuse deposited in those waters will in turn wash into navigable waters. *See United States v. Esso Std. Oil Co.*, 375 F.2d 621, 623 (3d Cir.1973).

**12.** *In United States v. Lambert*, 695 F.2d 536 (11th Cir.1983), the court held that a showing is

necessary because of the drastic nature of the remedy. And in *United States v. Kentland-Elkhorn Coal Corp.*, 353 F.Supp. 451 (E.D.Ky.1973), the court held that the Government had to make *some* showing of irreparable harm. (The court recognized, however, that the burden is lessened where the public interest is at stake.) However, there is plenty of general support for the contrary position. A preliminary injunction based upon the violation of a statute, *especially one which makes specific provision for injunctive relief*, may issue upon a showing that the federal statute has been violated. *Hecht Co. v. Bowles*, 321 U.S. 321, 331, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944); *United States v. Ingersoll-Rand Co.*, 320 F.2d 509, 523–524 (3d Cir.1963). Inherent in the statute itself is the legislative conclusion that violations of it cause irreparable injury to the public. *United States v. Ingersoll-Rand Co.*, 320 F.2d at 523–524; *United States v. Stoeco Homes, Inc.*, 359 F.Supp. 672, 678 (D.N.J.1973), *aff'd in part*, 498 F.2d 597 (3d Cir.) *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1974); *United States v. Nutrition Service, Inc.*, 227 F.Supp. 375, 388–389 (W.D.Pa.1964), *aff'd*, 347 F.2d 233 (3d Cir.1965). The *Stoeco Homes* case can be read to support this proposition. *See* 498 F.2d at 611.

fendant is economic loss. Even that would be minimal as this preliminary injunction would merely restrain defendants from further filling activities and require them to remove the tidal gate. This would allow the tidal waters to return until the issues in this matter can be finally decided. The defendant is free to fill and develop properties which are not in this wetland area.

In fact, the economic loss to the defendant from cessation of such activities is far outweighed by the benefit to the community from the enjoining of activities adversely affecting the environment. Moreover, any economic burden placed upon defendant by the injunctive relief sought in this case must be balanced against the significant benefits that will accrue to the public-at-large from abatement of the filling operation.

D. *The Public Interest*

Finally, in situations involving the Government, courts must determine whether the issuance of an injunction would further the public interest. In this context, the United States Supreme Court has noted that courts of equity "go much farther both to give and withhold relief in furtherance of the public interest ... when only private interests are involved." *Virginian Railway Co. v. System Federal No. 40,* 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937); *see Yakus v. United States,* 321 U.S. 414, 440–41, 64 S.Ct. 660, 674–75, 88 L.Ed. 834 (1944).

It is axiomatic that the public interest under the Clean Water Act requires strict enforcement of the statute so as to clean up the nation's waters and preserve the surrounding ecological environment. *See, e.g.,* 33 U.S.C. § 1251; *Train v. City of New York,* 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975).

Having fully examined the record in this case in terms of the criteria for granting a preliminary injunction, the court is convinced that a preliminary injunction must issue, and that the hearing to determine the Government's right to permanent relief must be expedited. At that hearing, the

parties are entitled to present any relevant, new factual evidence or relevant legal arguments which the court has not yet considered.

The foregoing constitutes this court's Findings of Fact and Conclusions of Law, pursuant to F.R.C.P. 52(a).

The accompanying order will be entered.