UNITED STATES of America, Plaintiff,

v.

Robert W. AKERS, et al., Defendants.

Civ. No. S–84–1276 RAR.

United States District Court,
E.D. California.

Jan. 8, 1987.

Pacific Legal Foundation, Sacramento, Cal., for California Cattlemen's Ass'n.

Walter Cook, Marysville, Cal., for Nat'l Audubon Society and Nat'l Wildlife Federation.

Lanny T. Winberry, Giattina & Winberry, Sacramento, Cal., for Akers.

Karen L. Patterson, Asst. U.S. Atty., Sacramento, Cal., for U.S.

ORDER GRANTING PLAINTIFF'S MO-
TION FOR PARTIAL SUMMARY
JUDGMENT AND DENYING DE-
FENDANT'S MOTION FOR PAR-
TIAL SUMMARY JUDGMENT

RAMIREZ, District Judge.

On July 21, 1986, the cross-motions of plaintiff United States of America and defendant Robert W. Akers for partial summary judgment came on regularly for hearing, the Honorable Raul A. Ramirez presiding. Assistant United States Attorney Karen L. Patterson appeared for the plaintiff. Lanny T. Winberry appeared for defendant Robert W. Akers. James S. Burling and Fred A. Slimp, II, Pacific Legal Foundation, appeared on behalf of the defendant intervenors California Cattlemen's Association, Agricultural Council of California, National Cattlemen's Association, and California Farm Bureau Federation. Walter Cook appeared on behalf of the plaintiff intervenors, the National Audubon

Society and the National Wildlife Federation.

The cross-motions present a single issue for resolution: whether the permit jurisdiction of the United States Army Corps of Engineers under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, extends to so-called "man-made" wetlands, or is limited to naturally occurring wetlands.

The pertinent background of the present motion can be summarized briefly. In early 1984 defendant Robert W. Akers [hereinafter "Akers"] purchased a ranch of approximately 9,600 acres in Modoc and Lassen Counties near Bieber, California, which contains a central marsh area known as the Big Swamp. The Corps of Engineers conducted a survey of the property and determined it to contain a central area of 2,889 acres of wetlands subject to its jurisdiction under the Clean Water Act. In approximately May, 1984, the District Engineer advised Akers that he needed a permit before he undertook certain proposed earth-moving activities in the Big Swamp. Akers then proceeded with activities that the Corps deemed to constitute violations of the Clean Water Act, and this lawsuit followed.

On September 23, 1985 this Court heard the prior partial summary judgment motion of the United States, in which it sought an order adopting the District Engineer's 2,889 acre wetland boundary determination for purposes of this lawsuit. In its motion, the United States argued that this Court should defer to the administrative survey. Akers, on the other hand, argued that since he had never applied for a permit, and therefore had never been provided the benefits of the full administrative permit procedure, this Court should adjudicate the existence and boundaries of the wetland on a *de novo* basis. The Court rejected both arguments, and remanded the matter back to the agency for further proceedings, in the course of which Akers was to be afforded some unusual discovery.

Akers then sought a stay of this lawsuit pending the outcome of negotiations with the State of California for the sale of a portion of his ranch. A sale was consummated and a status conference was held on March 31, 1986 to consider the appropriate course of future proceedings in the litigation.

In correspondence subsequent to the status conference, Akers indicated that he contests the Corps' wetlands survey on only one ground: He believes that it improperly includes what he terms "artificially created wetlands," by which he means wetlands that are dependent upon man-made irrigation and flood control structures for their water supply. Akers contends that Corps' jurisdiction is limited to naturally occurring wetlands. The United States, on the other hand, contests Akers' factual characterization of the wetlands but contends that, even if he were correct about the source of water, the wetlands would still fall with the scope of the jurisdiction of the Corps of Engineers. Both sides concede that the issue is strictly legal, and that its interlocutory resolution will substantially reduce the scope of the remaining controversy. The Court agrees that resolution of the issue by partial summary judgment is appropriate.

Accordingly, the Court having considered the memoranda and argument of the parties of both sides of the dispute, including the intervenors, it is hereby ordered that the plaintiff's motion for partial summary judgment is granted and defendant's cross-motion is denied.

So far as the Court has been able to determine, the issue is one of first impression in the Ninth Circuit, though it has been addressed in district court decisions from other circuits, including *Track 12, Inc. v. District Engineer, U.S. Army,* 618 F.Supp. 448 (D.Minn.1985) and *United States v. Ciampitti,* 583 F.Supp. 483 (D.N.J.1984). To resolve the dispute, the Court directs its attention first and foremost to congressional intent. Under the Clean Water Act, Corps jurisdiction extends to all "navigable waters," 33 U.S.C. § 1344, which are defined in the statute to encompass all "waters of the United States." 33 U.S.C. § 1362(7). It has repeatedly been

held that Congress intended the statutory definition to assert "federal jurisdiction over the Nation's waters to the maximum extent possible under the Commerce Clause of the Constitution" and that the term "navigable waters" as used in the Clean Water Act is not limited by traditional tests of navigability. *Ciampitti, supra,* 583 F.Supp. at 491; see also *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 462, 88 L.Ed.2d 419 ["Congress chose to define the waters covered by the Act broadly"]. Implementing regulations define the term "waters of the United States" to include all rivers and streams whose use or degradation could affect interstate or foreign commerce as well as any wetlands adjacent to such rivers or streams. 33 C.F.R. § 323.2(a)(3). The term "wetlands" is defined in the regulations to include:

> those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. 33 C.F.R. § 323.2(c).

The term "adjacent" is defined to mean "bordering, contiguous, or neighboring." 33 C.F.R. § 323.2(d). Moreover, the definition of the term "adjacent" is expressly defined to include wetlands that are separated from other waters of the United States by man-made structures:

> Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are "adjacent wetlands." *Id.*

No language in either section suggests that the manner in which the wetland was created or is maintained is relevant to whether it falls within the scope of the Clean Water Act. On the contrary, the plain language of the regulations emphasizes the nature of the land in question, not the manner by which it might have reached its wetland state. As the Court stated in *Ciampitti, supra,* "federal jurisdiction is determined by whether the site is presently

wetlands and not by how it came to be wetlands." 583 F.Supp. at 494. Such a focus is entirely consistent with Congress' intent that waters be defined as broadly as possible in order to provide the maximum degree of protection for the environment.

■ Akers argues that wetlands which receive their water supply through manmade structures or conduits fall outside the wetlands definition because they are not inundated "under normal circumstances" within the meaning of 33 C.F.R. § 323.2(c). The Court finds his reading of the language too restrictive. As the Supreme Court has recently observed, the regulatory reference to the types of vegetation growing in an area "under normal circumstances" is simply meant to exclude upland areas which demonstrate an aberrational presence of wetland vegetation. *United States v. Riverside Bayview Homes, supra,* 106 S.Ct. at 461.

Akers also argues that the *Ciampitti* and *Track 12* decisions are distinguishable on the ground that each involved wetlands created by man-made structures over which the landowner had no control. His observation may be factually correct. *Ciampitti* involved wetlands fed by tidal waters which flowed through a breach in a railroad embankment. It was not clear whether the breach itself was manmade or the result of a storm. 583 F.Supp. at 488. And in *Track 12, supra,* 618 F.Supp. at 449, the court accepted for purposes of a summary judgment motion the landowner's contention that the wetlands involved were "artificial" and had been created solely as the result of acts of state and local authorities, including the construction of a highway and storm sewage system. Here, on the other hand, Akers argues that his own irrigation and flood control structures, which he controls, have created "artificial" wetlands.

Whatever the validity of the factual distinction Akers asserts may be, the Court is not persuaded that it affects the relevance or persuasive authority of the two cases. Neither case contains any language to suggest that Corps jurisdiction over "artifi-

cial" wetlands depends upon who controls the structures which provide their water supply. On the contrary, each case focuses strictly upon the nature of the land in question. As just discussed, this Court finds such an approach to be consistent with the language of the definitional statute and regulations, as well as with the underlying legislative intent.

Certainly, it would have been a simple thing for Congress or the Corps to have written a limitation to so-called "naturally occurring" waters into the statute or regulations. They did not. Two courts have previously considered the issue and found no reason to read such a limitation into the definition. This Court finds nothing in the present record to warrant a different result and finds the *Ciampitti* and *Track 12* decisions to be applicable.

Both sides place heavy reliance upon the *Riverside Bayview* decision and both, predictably, argue that it supports their position. The Court finds the Supreme Court's decision to have less bearing on the present dispute than either side contends. To the extent that it provides any guidance, however, it supports the plaintiff's position. In *Riverside Bayview,* the Supreme Court observed that the legislative history of the Act evinces a concern that regulatory jurisdiction extend to the entire hydrologic cycle, which led to a broad definition of covered waters. 106 S.Ct. at 462. In addition, the court noted that Congress had considered and rejected attempts to narrow Corps' Section 404 jurisdiction over wetlands prior to passage of the 1972 Federal Water Pollution Control Act. 106 S.Ct. at 464.

 In short, the statutory and administrative definitions of "waters" and "wetlands" are broad enough to encompass so-called "man-made" wetlands and their inclusion is consistent with underlying legislative intent. The limitation argued for by Akers finds no support in the text of any cited statute or regulation. Imposition of such a limitation would run afoul of the oft-cited proposition that Corps jurisdiction under the Clean Water Act should be con-

strued broadly to further the Act's goal of protecting water quality. The limitation argued for by Akers has been rejected in two published district court decisions whose reasoning this court finds persuasive. For all of these reasons, the Court concludes that Corps' Section 404 jurisdiction extends to "man-made" wetlands which meet the definition set forth in 33 C.F.R. § 323.2(c).

Accordingly, plaintiff's motion for partial summary judgment is granted and defendant's motion is denied.

IT IS SO ORDERED.