**UNITED STATES of America, Plaintiff,**

v.

**MALIBU BEACH, INC., et al.,
Defendants.**

Civ. A. No. 88–4742.

United States District Court,
D. New Jersey.

April 27, 1989.

As Amended June 2, and June 19, 1989.

Samuel A. Alito, Jr., U.S. Atty. by James C. Woods, Asst. U.S. Atty., Newark, N.J., Letitia J. Grishaw and Margaret Kane Harrington, Environmental Defense Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., and John B.

Rutherford, U.S.E.P.A., New York City, for plaintiff.

Richard M. Hluchan, Drinker Biddle & Reath, Voorhees, N.J., for defendants.

### OPINION

JOSEPH H. RODRIGUEZ, District Judge.

This matter is before the court on an application by the United States for a preliminary injunction. The Government seeks to enjoin defendants from further engaging in fill activities at the Malibu Beach site, located in Atlantic Beach, New Jersey, and to obtain a mandatory injunction requiring defendant to remove fill material that presently exists at the site.

The Government claims jurisdiction over the property under the Federal Water Pollution Control Act (hereinafter the "Clean Water Act" or "CWA"), 33 U.S.C. § 1251–1376. For jurisdiction to attach, the Government must prove that the fill activities impair the flow of "waters of the United States," as defined by 33 C.F.R. 328.3(a), or that defendants have filled an area designated as "adjacent wetlands," i.e. wetlands adjacent to waters of the United States, as defined by 33 C.F.R. 328.-3(b).

A hearing was held on December 9, December 14, and December 22, 1988, and the parties have submitted both pre-trial and post-trial briefs in support of their positions.

### I. THE CLEAN WATER ACT

The Clean Water Act (hereinafter "CWA") prohibits the discharge of pollutants into waters of the United States except when permitted in accordance with restrictions established under other sections of the Act. See 33 U.S.C. § 1311(a). Section 404 of the CWA regulates the discharge of fill material into "navigable waters" by requiring a discharger to obtain an appropriate permit from the Army Corps of Engineers before depositing dredged or fill material. 33 U.S.C. § 1344; United States v. Ciampitti, 583 F.Supp. 483, 491 (D.N.J.1984).

The CWA broadly defines "navigable waters" to include "all waters of the United States, including territorial seas." 33 U.S. C. § 1362(7). The regulations published by the Environmental Protection Agency (hereinafter "EPA") and the Army Corps or Engineers (hereinafter "the Corps") for implementing the CWA define "waters of the United States" to include:

> All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, *including all waters which are subject to the ebb and flow of the tide;*
>
> \*  \*  \*  \*  \*  \*
>
> [and] wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1)–(6) of this section. . . .

33 C.F.R. § 328.3(a)(1), (7) (1987) (emphasis added); see also 40 C.F.R. § 230.3(s)(1), (7) (1987).

Regulation 328.4(b) states, in part, that the landward limits to CWA jurisdiction for tidal waters of the United States extend to the high tide line. 33 C.F.R. § 328.4(b)(1). The regulations define the high tide line as "the line of intersection of the land with the water's surface at the maximum height reached by a rising tide." 33 C.F.R. § 328.3(d). Section 328.3(d) further explains that in the absence of actual data, the high tide line may be established

> by a line of oil or scum along shore objects, a more or less continuous deposit of fine shell or debris on the foreshore or berm, other physical markings or characteristics, vegetation lines, tidal gages, or other suitable means that delineate the general height reached by a rising tide. *The line encompasses spring high tides and other high tides that occur with periodic frequency but does not include storm surges in which there is a departure from the normal or predicted reach of the tide due to the piling up of water against a coast by strong winds such as those accompanying a hurricane or other intense storm.*

33 C.F.R. § 328.3(d) (emphasis added).

In addition, the regulations define "wetlands" as

those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.

33 C.F.R. § 328.3(c).

## II. FINDINGS OF FACT

### A. *Waters Subject to the Ebb and Flow of the Tide*

The Malibu Beach property is located along Longport Boulevard, between Longport and Ocean City, New Jersey. It is bound to the east by the Great Egg Harbor Inlet, and to the west by Longport Boulevard. Malibu Beach consists of a beach area abutting the inlet, a central dune area, and a pool of water (hereinafter "the pool"), which is situated between the dunes and Longport Boulevard. The Government contends that the pool falls under the definition of "waters of the United States" as articulated in the Clean Water Act and its regulations, because before defendants conducted the alleged fill activities, the pool was subject to the influence of the tides from Great Egg Harbor Inlet. In the alternative, the Government argues that the fill areas contain wetlands adjacent to the inlet, as defined in the regulations, and are therefore within the jurisdiction of the CWA.

At the hearing before this court, the Government presented evidence to establish that defendants deposited fill material in low areas of the dunes in order to stop the tidal flow between Great Egg Harbor Inlet and the pool. Those areas were designated as the "western breach area" and the "central breach area." The Government also presented evidence to establish that these areas, as well as three other areas of Malibu Beach, designated the "half moon," "road fill," and "eastern fill"

areas, were wetlands within the meaning of the CWA.

Allen Jackson, a biologist employed by the United States Fish & Wildlife Service, testified at the hearing that he had visited the Malibu Beach site on March 10, 1983. He testified that on that date he observed a wrack lines [1] on both the pool side and the inlet side of the western breach area. *See* Government exhibits 13–14. Jackson stated that the wrack line on the pool side of the dunes indicated that the pool was subject to tidal flow when the tide was at its highest point.

Jackson testified that on October 2, 1984, he observed that tires, which have the effect of trapping sand, had been placed in the western breach area. Declaration of Jackson at 5, 9. He stated that on June 13, 1986, he again visited the property and noticed that, in addition to the tires, a considerable amount of soil and concrete rubble had been deposited in this area, creating a berm approximately 30 feet long and 10 feet wide, substantial enough to block the tidal flow from entering into the pool.

Jackson returned to the site on August 6, 1986, and photographed the western breach area. Government exhibit 16. He testified that on that day he observed a wrack line at the base of the berm on the inlet side, indicating that the berm had effectively blocked water from passing into the pool.

Jackson also testified that he went to the site on two occasions in 1987 and observed the condition of the berm. On June 5, 1987, he noticed that the berm had deteriorated since his June 13, 1986 inspection. On August 25, 1987, he noticed that the deposited tires were scattered throughout the pool, reflecting tidal influence on the pool itself. *See* Government exhibit 22.

The Government presented the testimony of Michael Claffey, an Army Corps of Engineers biologist who corroborated Jackson's testimony that a tidal connection had existed between the inlet and the pool through the central breach area before defendants deposited fill on the site. Claffey stated

---

**1.** A wrack line is a line of debris left on the beach by the receding tide. If debris is present in the ocean water during high tide, a wrack line will remain at the high water mark after the tide has receded.

that he had gone to the site on November 3 and 4, 1986 and took aerial photographs of the area which indicate a path of water through the central breach area connecting the inlet to the pool. *See* Government exhibits 2–4. The Government presented evidence that the monthly lunar spring high tides had been predicted to occur on November 3 and 4, and that there was no indication of storm activity in the area on either of those dates. *See* Declaration of Steven Sambol. The photographs presented by the Government clearly show a connection between the two bodies of water. Goverment exhibits 2–4.

Claffey testified that he obtained an aerial photograph of the site taken on March 8, 1987 and conducted a stereoscopic analysis of that photograph. *See* Government exhibit 32. According to Claffey, the photographs indicate that the central breach areas did not contain fill material at that time, and that the sand in the central breach area was moist. Claffey indicated that the photographs were taken when the tide was 1.84 feet below mean high water. *See* Government exhibit 35. Although the photographs do not show a direct connection between the inlet and the pool, Claffey opined that the existence of moist sand in this low-lying area indicates that the central breaches were subject to tidal inundation, and that the waters of the inlet would eventually reach the breach area at high tide.

Jackson also observed the central breach area on June 5, 1987, and testified that the area remained unfilled and contained some standing water. He concluded that the standing water was the result of the receding high tide. On August 20, 1987, Jackson observed that this area had since been filled. He also noticed a prominent wrack line located on the landward side of the fill material, indicating to him that the breach area where the fill had been placed was subject to the normal flow of the tide. *See* Government exhibit 28; *see also* Government exhibits 29–30. The Government supported Jackson's conclusion with evidence that no intense storm activity of sufficient intensity to cause the same effects had taken place on the New Jersey coast between June 1, 1987 and August 31, 1987. Declaration by Michael Caropolo at 3.

Defendants proffered evidence to show that changes have occurred at the site since 1962. Dr. Norbert Psuty, a recognized geomorphologist, testified that the dunes were subject to migration into the pool, and explained how breaches may occur in the dunes. He indicated that storm waves, surges, and currents can break through the dune ridge, transporting sand from the inlet side of the dunes to the pool side. An accumulation of sand in the shape of a fan then results on the inland side of the dunes. *See* Government exhibits 3, 3A. This movement of sand yields what is referred to as a "washover fan," which, according to Psuty, is the eventual location of the migrating dune ridge.

Psuty further stated that the migration of the dunes inland serves to enhance the strength of the dune structure. According to Psuty, the breaches that may occur due to storm activity, winds, or surges, resulting in the washover fans, will eventually heal as a result of natural processes. Psuty indicated that during this healing process the breaches close, and dune vegetation takes root, thus stabilizing the dunes. In Dr. Psuty's opinion, the central breaches depicted in Government exhibits 2–4 may have healed by natural processes after Claffey's observations in November, 1986.

Psuty indicated that the mean high tide range at Malibu Beach is approximately 2.38 feet above mean sea level. He stated that spring high tides, the highest predictable tides, are 1.6 feet higher than the mean high tide range. He concluded that the highest predictable and measurable tides at Malibu Beach, therefore, would reach 3.98 feet above mean sea level.

Psuty opined that the pool could not be subject to the predictable flow of the tides. He noted that the dune ridge at the site extends approximately six feet above mean sea level. Because the predictable level of the spring high tides (3.98 feet above mean sea level) does not rise above the six feet dune ridge, Psuty concluded that a measur-

able periodic tidal connection between the inlet and the pool could not exist.

Defendants also rely on a letter dated January 21, 1985, from the Army Corps of Engineers to defendant Albert A. Ciardi. Defendants exhibit D–1. The letter indicates that it was the Corps' position in 1985 that "the high tide line was established as corresponding to the three-foot contour line that runs along the Oceanfront portion of the property...." According to defendants, the letter indicates that as late as 1985 the Corps recognized that CWA jurisdiction extended no farther than the three-feet contour line, and therefore did not extend above the six-feet high dunes or into the pool beyond the dunes.

Finally, defendants proffered evidence to suggest that third parties enhanced or created the breaches in the dune area with the use of four-wheel drive and other off-road vehicles. Defendants assert that by effectively barring the use of such vehicles on the property, they have reduced the probability that any breaches will occur in the future as a result of spring high tides that are unaffected by a storm, unusual wave action, or high winds.

This court finds that the Government has established that the pool was subject to the ebb and flow of the tide in the central breach areas. Claffey testified that he saw a tidal connection on November 3 and 4, 1986, and took photographs of the area on that day. See Government exhibits 2–4, 7, 17. The pictures clearly depict a tidal connection between the inlet and the pool. Id. The Government submitted weather data for November 2–4, 1986, which indicated that the winds in that area did not exceed 13 miles per hour, and only light showers occurred on the second and on the fourth. Declaration by Steven Sambol. Also, the Government proffered evidence that a spring high tide, which may be considered for the purpose of determining the high tide line under section 328.3(d), was predicted for that date. In the absence of any direct evidence to the contrary, this court finds that the Government has satisfied its burden of proving that the pool on the Malibu Beach property was subject to the

ebb and flow of the tide on November 3 and 4, 1986.

This determination, however, does not resolve the issue of whether a tidal connection existed between the pool and the inlet at the time the fill material was placed in the central breaches. Defendants assert, relying on the testimony of Dr. Psuty, that the breaches closed naturally due to the washover fan effect, and that any fill activity merely reinforced the area that had already sealed by itself.

Courts have interpreted the regulations implementing the CWA liberally, because "Congress intended the Clean Water Act to assert 'federal jurisdiction over the Nation's waters to the maximum extent permissible under the Commerce Clause of the Constitution.'" *Ciampitti*, 583 F.Supp. at 491 (quoting *National Resource Defense Council v. Callaway*, 392 F.Supp. 685, 686 (D.D.C.1975)). As previously indicated, the Government established that the pool was subject to the ebb and flow of the tide as late as November 4, 1986. At that time, the Army Corps of Engineers had jurisdiction over the property under the CWA because the pool was part of the "waters of the United States." *See infra* p. 1311. As such, any fill activities would require a permit from the Corps. *See id.* at 1311. To defeat CWA jurisdiction, defendants must prove that before their dumping activities commenced between June and August, 1987, the dynamic nature of the property had caused these breaches to fill by themselves.

Defendants presented historical and topographical data to establish that such breaches heal naturally. They relied on the testimony of Dr. Psuty and on numerous exhibits that detailed the changes in Malibu Beach from 1962 to the present. Although defendants have established that the site has been subject to many changes caused by storm activity and erosion, they failed to present any direct evidence or testimony to show that after November 3 and 4, 1986, the central breach areas closed naturally, blocking the flow of the tide into the pool. Psuty only speculated that the central breaches could have healed by

themselves, and that if they did, the flow of the tide would have been blocked before the filling occurred.

The Government, on the other hand, strengthened its position that the breaches had been open before the area was filled. Michael Claffey testified that he conducted a stereoscopic analysis of the photograph taken on March 8, 1987, which depicted the central breaches when the water level was 1.84 feet below mean high tide. Claffey noted that the photograph reflected that the sand in the low area of the breaches was moist. Allen Jackson stated that on June 5, 1987, he saw some standing water there, indicating that the water had reached the central breaches at high tide.

The Government further demonstrated the tide's influence on the pool through its observation of the western breach area. Jackson testified that in 1983 he had inspected this area and observed wrack lines present on both the inlet side *and the pool side* of the dunes. Jackson again visited the western breach area on August 6, 1986, after the berm was created. He indicated that at that time a wrack line existed at the base of the berm on the inlet side. In August of 1987, Jackson again went to the western breach to inspect the condition of the berm, and saw that the tires that had been placed in the pool along the berm were scattered throughout the pool area. Government exhibit 22. Further, Claffey stated that on March 8, 1987, he noticed a wrack line near the berm on the inlet side. The testimony detailed above indicates that the water level on both sides of the berm fluctatued at periodic intervals in a manner that reflects tidal influence on the pool itself during the period of time in question.

Because a direct tidal connection existed at the central breach on November 3 and 4, 1986 and because the evidence suggests that the pool continued thereafter to be subject to the influence of the tide, and because there is no direct proof that the breach areas closed by natural causes, this court finds that the pool on the Malibu Beach property was subject to the ebb and flow of the tides of the Great Egg Harbor Inlet until fill material was placed on the property.

**B. *Wetlands at Malibu Beach***

The Government submitted the declaration of Ann Ciccotti, a Life Scientist employed by the United States Environmental Protection Agency—Regent II—Marine and Wetlands Protection Branch. Ciccotti reported that she conducted an inspection of Malibu Beach on July 27, 1988, to determine the impact of filling activities on the pool and to determine whether wetlands exist at Malibu Beach. She collected soil and vegetation data from four locations on the property. *See* Declaration by Ciccotti at exhibit A. Ciccotti stated that she used the three-parameter approach to wetlands delineation, as set forth in the EPA's *Wetland Delineation Manual,* to determine if the site contains wetlands.[2] *Id.* at 3. Several courts have recognized the three-parameter approach as an appropriate method to determine whether an area is a wetland. *See, e.g., Ciampitti,* 583 F.Supp. at 491 n. 4; *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 917–18 (5th Cir.1983); *United States v. Larkins,* 657 F.Supp. 76, 80–84 (W.D.Ky.1987), *aff'd,* 852 F.2d 189 (6th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1131, 103 L.Ed.2d 193 (1989).

Ciccotti indicated that there are five classifications of plant life species that may be associated with wetlands, according to the Plant List issued by the United States Fish and Wildlife Service: obligate wetland plants, facultative wetland plants, facultative plants, facultative upland plants, and upland plants. The categories reflect the probability that the environment in which a species of plant occurs is wetlands. Obligate wetland plants very rarely exist outside wetland areas. Therefore, there is a 99% probability that the area in which one of those species is found is wetlands. Facultative wetland plants exist in wetland areas with 67–99% frequency. Plants designated as facultative are found in wetland areas 34–66% of the time. Facultative upland plants are less frequently found in

---

**2.** The three-parameter approach requires an individual to record the species of vegetation, soil condition, and evidence of hydrology at a particular site.

wetland areas, at a probability of only 1–33%. Finally, upland plants are present in wetland areas less than 1% of the time. Declaration by Ciccotti at 4.

Ciccotti took samples of the plant life from each of the four areas she studied at Malibu Beach. Site 1 was located on the northwestern part of the property, between the pool and Longport Boulevard. *Id.* at exhibit A. She observed that all vegetation there was either facultative wetland or obligate wetland species. *Id.* at 5. The species present were Saltmeadow Cordgrass, Saltmarsh Cordgrass, Glasswort, Common Reed, and Hightide Bush. Ciccotti observed that the top six inches of soil at Site 1 is composed of course sand with heavy organic streaking. From six to twelve inches below the surface she noticed fine sand with an accumulation of organic matter. Ciccotti stated that the hole used for the sample filled with water at a depth of eight inches. *Id.* Based upon her observations, Ciccotti concluded, using the three-parameter approach, that Site 1 is a wetland area. *Id.*

Ciccotti next observed an area at the central-western part of the property, located between the pool and the dunes, referred to as Site 2. *See id.* at exhibit A. There she observed five types of vegetation: *Spartina patens, Spartina alternaflora, Salicornia, Phragmites australias,* and *Myrica,* the majority of which are species designated as obligate wetlands and facultative wetland plants. Ciccotti noted that the soil and hydrology observations at Site 2 were the same as those at Site 1. Thus, she concluded that Site 2 is also a wetland. *Id.* at 5.

Site 3 is located a short distance west of the central breaches, between the pool and the dunes, at the approximate center of the Malibu Beach property. *Id.* at exhibit A. At this site, Ciccotti observed *Spartina patens,* designated by the Plant list as a facultative wetland species, and *Spartina alternaflora,* an obligate wetland plant.

*Id.* at 5–6. The soil conditions at Site 3 were found to be similar to those of Sites 1 and 2. *Id.* at 6. In addition, Ciccotti observed dried algae on the ground, indicating that standing water had been present in that area for an extended period of time. As a result, Ciccotti concluded that Site 3 is a wetland. *Id.*

The fourth site was located at the eastern part of Malibu Beach, near the eastern fill. *Id.* at exhibit A. At Site 4 Ciccotti observed four species of vegetation, each of which was either an obligate wetland or facultative wetland species. *Id.* at 6. She indicated that the soil conditions at Site 4 were similar to those of the other three sites, and that water appeared in the sampling hole at nine inches below the surface. Thus, Ciccotti concluded that Site 4 is a wetland. *Id.*

Joseph Lomax, an environmental consultant, testified for defendants regarding the presence of wetlands at Malibu Beach. He agreed with Ciccotti that wetlands exist on the property. However, Lomax stated that for the sake of accuracy, he would have staked the property to delineate wetland areas, rather than merely drawing a sketch and plotting wetland locations.

Defendants further assert that no evidence exists to prove that they deposited fill material on the property.[3] Post-trial Memorandum by Defendants at 3. They concede that "limited wetlands" exist on the fringes of the pool, but claim that a proper wetlands delineation has not been conducted on the area. Defendants contend that a proper wetlands delineation would require mapping the entire area to determine precisely the extent of the wetlands on Malibu Beach. *Id.; see* Testimony of Lomax. Defendants therefore propose that the Government, in cooperation with Lomax, conduct a wetlands delineation to determine the extent to which wetlands exist in the half moon, 400 feet, road fill and eastern fill areas. Once a proper delin-

---

**3.** The record, however, indicates that three cease-and-desist orders were issued by the Corps to defendant Ciardi, directing him to stop all fill activities. Pre-trial brief by Government at 9–13. On each occasion, defendant Ciardi assert-

ed his objection to CWA jurisdiction over the property. *Id.* The record does not indicate that defendants complied with any of the cease and desist orders. *See id.*

zzzz

eation establishes precisely which areas are wetlands, defendants offer to remove voluntarily any fill materials on such wetlands within a reasonable period of time. Post-trial Memorandum by Defendants at 3–4.

This court, however, finds that the declaration of Ann Ciccotti affirmatively establishes that wetlands exist on Malibu Beach. Ciccotti utilized the three-parameter approach for wetlands delineation, and determined that wetlands existed at all four sites. Defendants proffered no evidence to contradict Ciccotti's conclusion that Malibu Beach contains wetlands. In fact, defendants admit that wetlands are present on the property. Therefore, this court finds that the Government has shown that wetlands exist on Malibu Beach.

### C. *Wildlife on Malibu Beach*

The Government proffered evidence to show that numerous birds inhabit the Malibu Beach property, including two endangered species, the piping plover and the least tern. C. David Jenkins, a Senior Zoologist for the State of New Jersey, Department of Environmental Protection, Division of Fish, Game & Wildlife & Nongame Species Program, reported that the piping plover utilizes the site for nesting. Declaration of Jenkins at 2–5. Jenkins indicated that the piping plover uses the pool behind the dunes as an alternative feeding ground, and that the dunes provide the birds with protection from humans and terrestrial predators. *Id.* at 4–5.

Lomax also testified regarding the nesting and feeding habits of the piping plover. He stated that the bird typically nests on the oceanward foot of beach dunes and feeds within the intertidal zone of the ocean. While the piping plover at Malibu Beach would typically nest and feed on the side of the dunes facing the Great Egg Harbor Inlet, Lomax agreed with Jenkins that the pool constitutes an important alternative feeding ground for this endangered species.

In addition, Lomax testified that the least tern, which has used Malibu Beach in the past, has not been seen at the property since 1983. The Government proffered no direct evidence to rebut Lomax's testimony,

but asserted that migratory birds, including the piping plover and least tern, continue to use the property for feeding and nesting, and as a "stop-over" point during migration. Post trial brief by Government at 26.

The Government also introduced a photograph taken by Allen Jackson on August 20, 1987, which depicts numerous shore birds at the edge of the pool. Government exhibit 28. This photograph clearly indicates that birds utilized the pool area at Malibu Beach. *Id.*

This court finds that the Government has established that migratory and shore birds, including the piping plover, utilize the property and the pool for stop-over purposes and for feeding and nesting. Jenkins and Lomax agree that the piping plover nests at the site and uses the pool as an alternative to its primary feeding area, which is located on the inlet side of the dunes. Defendants do not dispute this fact. Post-trial memorandum by Defendants at 17–18. It is also undisputed that the piping plover has recently been seen at Malibu Beach. Furthermore, Government exhibit 28 clearly shows shore birds utilizing the area surrounding the pool as a stop-over and feeding ground.

The Government, however, failed to establish that the endangered least tern utilized the property any time after 1983. The Government did not proffer evidence to rebut Lomax's testimony that the bird has not recently been seen at Malibu Beach, and, therefore, has not satisfied its burden of proof.

In addition, other species of wildlife utilize the pool area at Malibu Beach. *See* Declaration of Ann Ciccotti at 6. Ciccotti reported that muskrat runs and fiddler crab burrows existed on the site on August 25, 1988. She observed two muskrats in the eastern area of the pool and numerous juvenile fishes, called "killifish," located among a thick growth of algae in the pool. Ciccotti opined that because the fish were very young, spawning had occurred within the pool. *Id.* at 8. Finally, she reported to have observed numerous minute mounds of

earth along the edge of the pool, indicating the presence of invertebrates. *Id.*

## III. CONCLUSIONS OF LAW

### A. *Standard for Preliminary Injunctive Relief*

The traditional test for whether a preliminary injunction should issue was articulated by the Third Circuit in *Ecri v. McGraw–Hill:*

> [T]he party seeking a preliminary injunction bears the burden of producing evidence sufficient to convince the court that (1) the movant has shown a reasonable probability of success on the merits; (2) the movant will be irreparably injured by denial of relief; (3) granting preliminary relief will not result in even greater harm to the other party; and (4) granting preliminary relief will be in the public interest.

*Ecri v. McGraw–Hill,* 809 F.2d 223, 226 (3d Cir.1987) (citation omitted).

■ In addition to having the authority to forbid the continuance of a course of conduct, the court may also compel a party to perform a particular act. *See United States v. Price,* 688 F.2d 204, 212 (3d Cir. 1982). Mandatory injunctive relief "is an extraordinary remedy that should be granted only under compelling circumstances and in a limited manner to restore the status quo." *Golden State Transit Corp. v. City of Los Angeles,* 660 F.Supp. 571, 575 (C.D.Cal.1987); *see Price,* 688 F.2d at 212–13. A mandatory injunction may be issued if the status quo "is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury upon complainant." *Price,* 688 F.2d at 212 (quoting *Toledo, A.A. & N.M. Ry. Co. v. Pennsylvania Co.,* 54 F. 730, 741 (N.D.Ohio 1893)). A mandatory preliminary injunction designed to prevent that injury is "appropriate if the other criteria relevant to issuing preliminary injunctions are satisfied." *Price,* 688 F.2d at 212.

### 1. *Reasonable Likelihood of Success on the Merits*

(a) Waters of the United States

The CWA prohibits discharge of any pollutants by any person. 33 U.S.C. § 1311(a). The Act's jurisdiction extends to "all waters of the United States, including territorial seas." 33 U.S.C. § 1362(7); *see* 33 U.S.C. § 1311(a). The CWA regulations extend the definition of waters to include all waters subject to the ebb and flow of the tide. 33 C.F.R. § 328.3(a)(1); *supra* at 1303.

■ The landward limit of CWA jurisdiction in tidal waters extends to the high tide line. C.F.R. 328.4(b)(1); *supra* at 1303. The high tide line encompasses all tides, except for those tides affected by "strong winds such as those accompanying a hurricane or other intense storm." 33 C.F.R. § 328.3(d); *supra* at 1303.

Defendants contend that the Government cannot utilize information gathered in August of 1987 to establish tidal influence in the pool. Defendants argue that *any* storm activity would cause the high tide line for that day to occur beyond the normal and predictable range of the tide. *See* 33 C.F.R. § 328.3(d). In the alternative, defendants argue that the winds that accompanied the August, 1987 storm activity, reported to have had velocities between 29 and 41 miles per hour, were "strong winds such as those accompanying a hurricane or other intense storm." *Id.* Therefore, defendants assert that the Government has failed to establish that the central breaches did not close by natural causes before the alleged fill activities occurred.

The Government asserts that the regulations exclude only those tides affected by intense storms of a synoptic scale. Such storms are "a complex of pressure, winds, clouds, and precipitation that is typically associated with systems of low pressure on the order of a few hundred to 1000 miles in diameter with a well-defined center." Post-trial Brief by Government at 13. Thus, the Government argues that the regulations refer only to large scale storms causing predictable departures from the normal high tide line.

This court rejects the Government's narrow interpretation of section 328.3(d). Such an interpretation would write into the

regulations specific dimensional requirements for the term "other intense storms." A plain reading of the regulation indicates that no such limitation is contemplated in the CWA. Localized storms, accompanied by hurricane force winds, for example, would not satisfy the Government's definition, but certainly may cause the type of departure from the normal and predictable range of the tides contemplated by regulation 328.3(d).

■ However, this court also rejects defendants' position that any storm activity could fall within the section 328.3(d) exception. The regulation clearly refers to the strength of the winds accompanying the storm, and does not contemplate that evidence of any storm or rain in the vicinity can defeat jurisdiction of the CWA. Excluded from the high tide line are those tides affected by intense storms, accompanied by strong winds. The regulations, however, do not exclude tides that involve mere rain storms with lighter wind activity.

■ Defendants proffered evidence to show that wind conditions on August 25, 1987 ranged between 29 and 41 miles per hour. Even if accompanied by rain storm activity, winds of this magnitude do not rise to the level of "hurricane or other intense storms." Hurricane force winds, by definition, occur at wind velocity of 74 miles per hour or greater. *The Weather Almanac* at 44 (J. Ruffner & F. Bair 3d ed. 1981). This court need not determine the minimum wind force that falls within the exception of section 328.3(d). However, this court finds that winds of 41 miles per hour do not constitute "strong winds" as contemplated by section 328.3(d). The high tide lines observed in August, 1987, fall within the defined normal and predictable range of the tides.

■ The Government has presented strong evidence demonstrating that the pool was subject to the ebb and flow of the tide at the time it was filled. *Supra* at 1304–1305. A tidal connection existed through the central breaches on November 3 and 4, 1986, at a time when the tide was unaffected by intense storm activity. *Id.* at 1305, 1306. Observations of the site made throughout August, 1987 indicate that the water level in the pool rose periodically, evincing tidal influence in the pool. *Id.* at 1304–1305. Dr. Psuty's testimony merely suggests that the tidal flow may have been blocked by the dunes before fill material was dumped. *Id.* at 1305–1306, 1307. Accordingly, this court finds the pool behind the dunes at Malibu Beach was subject to the ebb and flow of the tide up until fill activities began on the property. The pool is therefore a water of the United States within the jurisdiction of the CWA as defined in regulation 328.3(a)(1). Defendants, therefore, were required to obtain a permit from the Army Corps of Engineers before they began filling on the property.

### (b) Adjacent Wetlands

Wetlands, for the purpose of the CWA, are those areas that are inundated or saturated by water at such a frequency to support vegetation typically adapted for life in saturated soil conditions. 33 C.F.R. § 328.3(b). The regulations define "adjacent" to mean "bordering, contiguous, or neighboring." 33 C.F.R. § 328.3(c). "Adjacent wetlands," therefore, are all wetlands bordering, contiguous, or neighboring waters of the United States, including those wetlands that are separated therefrom "by man-made dikes or barriers, natural river berms, beach dunes and the like." 33 C.F.R. § 328.3(a)(7), (b), (c).

The Supreme Court in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), examined the definition of wetlands for the purpose of the CWA. The Sixth Circuit had held that an area is not an adjacent wetland unless it is subject to flooding by adjacent navigable waters at a frequency sufficient to support the growth of aquatic vegetation. *United States v. Riverside Bayview Homes, Inc.*, 729 F.2d 391 (6th Cir.1984). The Supreme Court reversed, determining that

> [t]he plain language of the regulation refutes the Court of Appeals' conclusion that inundation or "frequent flooding" by the adjacent body of water is a *sine qua non* of a wetland under the regula-

tion. Indeed, the regulation could hardly state more clearly that saturation by either surface or ground water is sufficient to bring an area within the category of wetlands, provided that the saturation is sufficient to and does support wetland vegetation.

474 U.S. at 129–30, 106 S.Ct. at 460–61.

■ In the present case, the Government has presented ample evidence to show that wetlands exist on Malibu Beach. *Supra* at 1307–1308. Ann Ciccotti observed the presence of water only eight to nine inches below the surface at each site on Malibu Beach. Each area contains both obligate wetland plants, present in wetland areas over 99% of the time, and facultative wetland plants, commonly found in wetland areas with a frequency of 67%–99%. Ciccotti's findings indicate that the property contains wetlands as defined in regulation 328.3(b). Defendants failed to present any evidence to refute this determination. This court, therefore, concludes that Malibu Beach contains wetlands for the purposes of the CWA. *Id.* at 1308.

■ To fall within the definition of adjacent wetlands, a wetland area must be "bordering, contiguous or neighboring" waters of the United States. This court has already determined that the pool was subject to the ebb and flow of the tide from Great Egg Harbor Inlet, which is a navigable waterway within the definition of "waters of the United States." Thus, the wetlands at Malibu Beach are adjacent to waters of the United States for the purpose of the CWA.

Additionally, the wetland areas of Malibu Beach fall within the jurisdiction of the CWA by an alternative means. The CWA regulations include as adjacent wetlands those areas separated by certain man-made

or natural structures, including "beach dunes and the like." 33 C.F.R. § 328.3(c). Great Egg Harbor Inlet is a navigable waterway and therefore a water of the United States within the jurisdiction of the CWA. The wetlands of Malibu Beach are separated from the inlet only by beach dunes and sand. Even if this court concluded that the central breach areas had closed by natural causes before fill materials were deposited and that therefore there was no tidal connection between the two bodies of water, the wetlands contained in Sites 2, 3 and 4 are adjacent to the waters of the Great Egg Harbor inlet. Because defendants' property contains wetlands adjacent to waters of the United States, defendants were required to have a permit to fill on the property. *See Riverside Bayview,* 474 U.S. at 135, 106 S.Ct. at 464.[4]

### 2. Irreparable Injury

■ The Government has made a sufficient showing of irreparable harm to the environment of Malibu Beach.[5] The Government established that migratory birds use the property for feeding and nesting. *Supra* at 1309–1310. The piping plover, an endangered species, uses the tidal pool as an alternative feeding ground. *Id.* Defendants assert that the destruction of an alternative feeding ground does not constitute irreparable harm because the piping plover remains free to utilize the inlet side of the dunes as its primary feeding area. This court disagrees. Although the piping plover uses the pool only as an alternative feeding ground, that area may be needed for protection from predators and from tides affected by storms. The availability of alternative feeding grounds does not eliminate the potential injury to these endangered birds. Also, fiddler crabs and muskrats, which require a moist habitat,

---

**4.** As the *Riverside* court indicated, not all adjacent wetland areas are of great importance to the environment. 474 U.S. at 135 n. 9, 106 S.Ct. at 463 n. 9. In those situations, "the Corps may always allow development of the wetland for other uses simply by issuing a permit." *Id.* However, whether the wetlands are significantly intertwined with the ecosystems of adjacent waterways does not effect CWA jurisdiction over the property. *Id.*

**5.** It is unclear in this circuit whether the Government must make a showing of irreparable harm for a violation of the Clean Water Act. *See Ciampitti,* 583 F.Supp. at 498. This court does not need to decide this issue because the Government has made a sufficient showing of irreparable harm.

utilize the wetlands on the pool side of the dunes, and juvenile fish have been observed in the pool waters. If the fill remains on the property, precluding the passage of water from the inlet to the pool, the habitat for these animals will eventually disappear.

■ Equitable relief is appropriate here because there is no adequate remedy at law to compensate the public for the harm caused by the disposal of fill material into waters of the United States or in wetlands. *Ciampitti,* 583 F.Supp. at 498. The tidal pool and the wetlands serve a variety of critical functions, including providing a habitat for wildlife, a stop-over and feeding ground for migratory birds, and a nesting ground for the piping plover. Just as the court observed in *Ciampitti,* "[o]nly if the filling is immediately enjoined will the United States have the continuing benefit of the ecologically valuable lands." *Id.*

### 3. Possibility of Harm to Defendant

■ This court finds that the only foreseeable injury to defendants or any other interested party is economic loss. Defendants' loss, however, would be minimal, because injunctive relief would only require them to cease fill activities and remove fill material placed on the property. This will permit the tidal waters to return until the issues are finally decided. *See Ciampitti,* 583 F.Supp. at 499.

### 4. Public Interest

■ The express purpose of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Strict enforcement of the CWA can only further the public interest of cleaning up the nation's waters and preserving the surrounding ecological environment. *Ciampitti,* 583 F.Supp. at 499. In the present case, the relief sought by the Government goes beyond private interests, and clearly involves matters of public concern. Accordingly, this court finds that the requested injunctive relief would further the public interest.

### B. Relief

The Government has satisfied its burden for the issuance of preliminary injunctive relief barring defendants from further filling at Malibu Beach. In addition, this court is satisfied that mandatory injunctive relief requiring the removal of fill material placed at the site is necessary.

In this case, the status quo is a condition of action, and the existing condition of rest, where the fill material continues to exist at Malibu Beach precluding the flow of water into the pool, will cause serious harm to the ecological value of the property. *See Price,* 688 F.2d at 212. If this court allowed the fill to remain on the site, the very damage sought to be remedied by this action would continue, irreparably injuring the environment.

1. Defendants are required to remove all fill material from waters of the United States present on the Malibu Beach property, to the extent described:

a. *Western Breach.* The western breach is a berm area lying between Great Egg Harbor and the tidal pool of the Malibu Beach property in the extreme western portion of the property. Fill is to be removed from the western breach between the area marked by the yellow ribbons which have been placed at each end of the berm. This area constitutes a distance of 63 feet from west to east. Fill is to be removed to the depth indicated by a marker at the base of the berm.

b. *Central Breaches.* The central breaches are located eastward along the beach from the western breach. Fill is to be removed from the first central breach between the area marked by the yellow ribbons which have been placed at both ends of the fill, which spans some 19 feet from west to east. Fill is to be removed from the second central breach between the area marked by the yellow ribbons which have been placed at both ends of the fill, which spans some 36 feet from west to east. Fill is to be removed from the third central breach between the area marked by the yellow ribbons which have been placed

at both ends of the fill, which spans some 31 feet from west to east.

c. *Road Fill.* The road fill is located east along the beach and through the dunes to the tidal pool and the southern end of the violation that the parties have designated as such. Fill is to be removed from the road fill area beginning at the point on the southern end marked by a yellow ribbon and northward for the entire length of the fill area which extends to the northern edge of the tidal pool. This fill shall be removed to a depth that is level with the natural contour of the tidal pool bottom.

d. *Beach Fill.* The beach fill is located toward the beach from the road fill and eastward until one reaches an area constituting a long mound of material approximately 4 feet high. The area of the violation measures approximately 170 feet east to west. This fill shall be removed.

e. *Eastern Fill.* The eastern fill is located in the tidal pool, on the northern side, just west of Sutor's Sports Club. The violation is comprised of two areas of fill: the first or northernmost area (located a short distance from the edge of the tidal pool) is approximately 10 feet high and 27 feet wide measured east to west. The second area of fill lies just to the south and west of the first. It is a graded area that forms an "L" shape that measures approximately 62 feet north to south and 50 feet west to east. The particular location and dimensions of the eastern fill areas are evidenced by the raised contour they form in contrast to the undisturbed grade of the tidal pool bottom. This fill shall be removed.

f. *Half Moon Fill.* The half moon fill is a fill in the shape of a half moon that exists on the edge of the tidal pool oceanward of Longport Boulevard. The portion of the half moon fill that lies in waters of the United States measures 138 feet from west to east and 58 feet from north to south. This portion of the fill shall be removed.

Any and all additional removal of fill, including removal of fill from the 400 feet fill, and any additional restoration of the affected areas shall occur following a final disposition of the case on the merits.

The removal of the fill ordered above shall occur under the supervision of representatives of the United States. Any disputes regarding the proper implementation of this order shall be resolved in the first instance between representatives of defendants and representatives of the United States. Should such resolution prove impossible, then such dispute shall be presented to this Court.

## IV. CONCLUSION

This court concludes that preliminary relief barring further fill activity at Malibu Beach, and mandatory injunctive relief, requiring removal of fill material already in place at the site, must issue. The Government has established a strong likelihood of success that defendants placed fill in waters of the United States and on adjacent wetlands, in violation of the Clean Water Act. This court also finds that irreparable injury will occur to wildlife and to the environment if such relief is not granted. Further, the potential economic harm to defendants is minimal compared to the potential damage to the environment if relief is not granted. Finally, the public interest of maintaining clean waters and preserving the surrounding ecological environment can only be furthered by the granting of this preliminary injunction.

The foregoing serves as the court's Findings of Facts and Conclusion of Law pursuant to Fed.R.Civ.P. 52(a).

An appropriate order will be issued.