THE DEPARTMENT OF TRANSPORTATION, Plaintiff-Appellee, v. LA SALLE NATIONAL BANK *et al.*, Defendants-Appellants.

Second District   No. 2—92—1157

Opinion filed November 8, 1993.

Don E. Glickman, of Chicago, for appellants.

Roland W. Burris, Attorney General, of Springfield (Douglas G. Felder, Special Assistant Attorney General, of Chicago, and Rodney D. Cavitt, Special Assistant Attorney General, of Elgin, of counsel), and Richard A. Redmond, of McBride, Baker & Coles, of Chicago (Robert S. Hirschhorn, of counsel), for appellee.

JUSTICE DOYLE delivered the opinion of the court:

Plaintiff, the Department of Transportation (DOT), brought a condemnation action against defendants, La Salle National Bank, Chicago Title and Trust Co., Northern Trust Co., John Stoetzel, Freightliner Corporation, FC 1000 Mittel Venture, Forest Creek Owner's Association, and unknown owners (hereinafter referred to collectively as Stoetzel), in the circuit court of Du Page County. Defendants timely appeal from the judgment entered on a jury award for just compensation in the amount of $161,390 with zero damages to the remainder and the denial of their post-trial motion.

Defendants raise the following issues on appeal: (1) whether the trial court erred in denying the property owner's motion *in limine*, which sought to bar DOT's witnesses from testifying that the potential for development and value of the subject property was limited because it was a jurisdictional wetland; (2) whether the trial court erred in denying the property owner's motion to strike the testimony by DOT's engineer that the potential for development of the subject property was limited because it was a jurisdictional wetland; and (3) whether the jury verdict was against the manifest weight of the evidence.

### THE PROPERTY

On March 8, 1989, DOT filed an action to condemn an approximately 3.7-acre portion of an approximately 7.5-acre vacant parcel of land located on Thorndale Avenue in Wood Dale, Illinois. DOT sought to acquire the 3.7-acre portion as a part of the proposed Elgin-O'Hare expressway. Defendant John Stoetzel is the sole beneficial owner of the subject site under the terms of a land trust agreement.

In 1981, Forest Creek Industrial Park was annexed into Wood Dale, and approximately one year later development of the property began. The property was initially comprised of a single lot known as unit 1. Over the next couple of years additional plats of subdivision were recorded, resulting in three additional units. In 1986 or 1987, unit 3, now referred to as unit 3N, was resubdivided, creating four lots for development plus an out-lot. The out-lot is the subject site. As

a result of improvements constructed on the lots available for development, Stoetzel constructed a 2.1-acre retention basin on the subject site to accommodate water runoff from the development lots.

The subject site can be described as a flag-shaped parcel with the pole running southward, along the Salt Creek, from the northwest corner of the property. It is located entirely within a larger development known as the Forest Creek Industrial Park. The northern boundary of the subject site is Thorndale Avenue, which is oriented along an east-west line; the subject site is bounded to the east and the south by the remaining portions of the Forest Creek Industrial Park (Forest Creek). The portion taken in the condemnation action comprises what could be characterized as the top three-fourths to seven-eights of the pennant.

Nearly the entire site is located within the Salt Creek floodplain, which consists of those lands that would be submerged in the event of a 100-year flood. A portion of the subject site is also located within the Salt Creek floodway, which is that portion of the floodplain that would serve as the channel for the water in the event of a 100-year flood. The central issue at trial focused on the highest and best use of the subject site and the effect such use would have on the ultimate valuation of the property.

JURISDICTIONAL WETLAND

The Army Corps of Engineers (Corps) exercises jurisdiction over the waters of the United States, and, to the extent that a property is determined to be a wetland, no filling or dredging may be accomplished on that property without first obtaining a permit from the Corps. (33 C.F.R. §§323, 330 (1991).) If no permit is obtained and the property is determined to be a jurisdictional wetland, the Corps is vested with the power to issue cease and desist orders.

Defining the term "jurisdictional wetland" begins with section 404 of the Clean Water Act, which extends Federal jurisdiction over the navigable waters of the United States. (33 U.S.C. §1344(a) (1989).) Navigable waters are defined in the Clean Water Act to encompass all "waters of the United States" (33 U.S.C. §1362(7) (1989); *United States v. Akers* (E.D. Cal. 1987), 651 F. Supp. 320, 321), and it has been noted that the term is not limited by traditional tests of navigability (*Akers*, 651 F. Supp. at 322). The term "waters of the United States" includes wetlands (33 C.F.R. §328.3(a) (1991)), which are defined as:

> "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support,

and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas." 33 C.F.R. §328.3(b) (1991).

### DEFENDANTS' MOTION *IN LIMINE* NO. 3

Prior to trial, defendants moved *in limine* to exclude the testimony of DOT's witnesses regarding whether the subject site should be considered a jurisdictional wetland and the effect such a classification would have on value. Defendants further moved to bar any opinions of value or highest and best use premised on the conclusion that the subject site was a jurisdictional wetland. Defendants contended that on the date DOT filed the condemnation action, March 8, 1989, it admitted that the part of the property proposed for development was not a wetland and that the Corps had not classified it as such.

In support of its motion, defendants attached excerpted copies of a draft environmental impact statement (EIS), published in 1987, a final environmental impact statement, published in 1990, and the FAP 426 Elgin-O'Hare Expressway Design Report, which were submitted by, among others, DOT and the Corps. The relevant portions of all three documents did not identify the subject site as wetlands. Defendants further contended that because the Corps had not designated the subject site as wetlands on March 8, 1989, the date the condemnation action was filed, no permit was required for development, thus supporting the conclusion that the subject site was not a jurisdictional wetland.

Defendants also attached to their motion the affidavit of Thomas Slowinski, former chief of the regulatory functions branch of the Army Corps of Engineers, which stated that the Corps did not consider the nonfloodway portion of the property to be jurisdictional wetlands requiring a permit on the date of condemnation. This affidavit was not offered into evidence at trial.

DOT responded to defendants' motion on the grounds that the consultant's study, upon which the draft EIS was founded, was conducted in 1985 or 1986 based upon 1979 criteria for establishing wetlands; that the 1990 final EIS did not purport to return to the area and reassess anything that was done in conjunction with the 1987 draft EIS; and that the construction of the detention basin did not appear in the environmental impact studies because it occurred following the consultant's study upon which both the draft and final EIS were predicated. The trial court denied defendants' motion, and the cause proceeded to trial.

DEFENDANTS' CASE IN CHIEF

Christopher Lannert, a landscape architect and land planner, testified that he first became familiar with the subject site in 1980. Lannert opined that the highest and best use for the property was office use. He defined highest and best use as the use which is physically possible, jurisdictionally achievable, and developmentally feasible. Lannert based his opinion on the historical development of the project, the surrounding uses, and site specifics. Lannert explained the historical development of Forest Creek through the use of exhibits depicting the property at different times. Although the process was subject to constant revision, the concept underlying the development plan was to start in the southeast portion of Forest Creek and to develop the property towards the northwest.

Unit 3N, representing a subsequent phase of development, designated a portion of what was referred to as unit 3 to be resubdivided. As part of unit 3N, Lannert created an out-lot, parcels for development, a greenway easement along the western edge of the parcel, floodway, a utility easement, and an area for tree preservation. He earlier explained that out-lots are originally positioned as holding patterns within a development, and if, at the time a plat is prepared, a particular portion of the property does not have a specific use, that portion is designated as an out-lot.

The most recent plat for Forest Creek was designated as unit 3P. The plat reflected the addition of buildings, a remodeling of the storm retention basin to construct a particular building, a reaffirmation of the vegetation, and the creation of an additional retention pond. Lannert further opined that the historic progression of development contemplated an outward orientation for constructing office, manufacturing, and warehouse space.

Lannert further testified that the trend of development in the surrounding area was for expanding office and industrial uses. He utilized aerial photographs taken from 1980 to 1990 to illustrate the increasing number of buildings in the surrounding area. The photographs depict an approximately four-square-mile area surrounding the subject site. Additionally, Lannert pointed out that the specific site had accessibility to a highly traveled corridor, orientation to amenities, and good visibility.

Lannert also prepared an exhibit to demonstrate what he thought possible for development on the subject site. Based upon, among other things, his knowledge of the annexation agreement and local ordinances, Lannert opined that a building and parking area occupying

approximately 52,000 square feet of the subject site could be constructed. Allowing for variations in the building and parking configuration, Lannert further opined that it would be possible to construct an office building in the 90,000- to 150,000-square-foot range, while still meeting criteria for parking, floor area ratio, and permissible lot coverage. He further stated that his hypothetical building would require a special use permit from the City of Wood Dale because it would be partially located within the flood fringe area. Lannert opined that a special permit would issue because two other sites near the subject site were granted special use permits.

On cross-examination, Lannert admitted, with respect to the subject property now and the bottom of the detention basin, that the property had the general looks and characteristics of wetlands. Lannert further stated that because of the temporary nature of the storm water pond and because it had no outlets, the property could be classified as man-made wetlands. When specifically asked whether the property had wetlands on it, Lannert responded, "Yes, it has wetlands on it, natural and man made." Lannert further testified that once wetlands are identified it is necessary to obtain a permit from the Corps.

On redirect examination, Lannert stated that based upon his conversations with other witnesses, and in particular Thomas Slowinski, the subject site had not been classified as wetlands. Lannert also stated that even if the area is man-made, if it is classified as wetlands, a permit is required.

John Stoetzel, the beneficial owner of the subject site, testified that he has developed numerous buildings over the past 20 years and that all of them involved the filling in or construction over or around retention basins. He further testified that some of the water runoff from the Motorola building, which was situated near the subject site, was directed to a temporary retention basin constructed on the subject site. Stoetzel chose that location because it was simple to accomplish and economical. Additionally, because he knew that he intended to develop the subject site, Stoetzel did not want to construct a "big, fancy retention" pond.

Stoetzel opined that the highest and best use of the subject site would be for the construction of a "significant, substantial office building." The site has outstanding access and visibility. The neighborhood has hotels, and the surrounding office and industrial buildings are attractive. Additionally, the former Hamilton Lakes development (now the Chancellory), which has 200,000- and 300,000-square-foot office buildings, would provide an ideal "feed" for future clients.

In 1987, Stoetzel prepared a plan for the development of an office building on the property. The proposed building was three stories with an attached four-story parking deck. The plan was presented to the plan commission and city council of Wood Dale. Additionally, Stoetzel obtained a special use permit to construct the building within the confines of the floodplain as it was construed at that time. Following approvals from local authorities, Stoetzel applied to DOT for approval of plat. Stoetzel, however, was advised to discontinue developing the property because DOT was in the process of acquiring property along the Thorndale corridor, which would later be utilized for the Elgin-O'Hare expressway.

Based upon his experience as a developer, looking at the parcel as a possible location for development, and what he thought he could do with the property, Stoetzel opined that the subject site had a value of $1,450,000. Stoetzel also considered comparable sales in the area, which were the Agitron property, at approximately $6.25 per square foot, and the Marriott property, at approximately $9 per square foot. For comparison, Stoetzel valued the subject site at $7 per square foot. He further stated that the portion remaining after the taking would be of no value because of its small size and that the retention area was not a jurisdictional wetland. Stoetzel admitted that he had written the land trustee in 1987 urging it to reduce its service fees because the subject site, as a detention area, had little or no value.

Thomas Slowinski, a former employee and chief of the regulatory functions branch of the Army Corps of Engineers from 1976 until August 1989, testified that his office was responsible for section 404 wetland permitting and regulating wetland activities. Slowinski explained that if an area is determined to be a jurisdictional wetland, any development, placement of fill, or alteration would require a permit.

Slowinski testified that he was directly involved in the review of the Elgin-O'Hare corridor and that the Corps was a cooperating agency in the preparation of a draft environmental impact statement. As part of his duties, he conducted field reviews of all the significant wetland areas. Slowinski further testified that DOT hired a consultant to do a wetland determination for the entire corridor, including the preparation of maps on large scale aerial photographs.

As of March 1989, Slowinski considered the draft EIS as a written wetland determination by the Corps. When asked whether the portion of the subject site located outside of the floodway was a jurisdictional wetland, Slowinski replied that it was not mapped nor would it be considered a jurisdictional wetland.

Karl Karth, an MAI real estate appraiser, testified that he was hired in 1988 to provide Stoetzel with an economic evaluation of the subject site. Prior to reaching his opinion as to value, Karth discussed with Stoetzel the site and its location relative to the floodway. Karth also visited the site on six or seven occasions, drove through the neighborhood, reviewed the zoning, and checked sales data that was representative of the subject property. He also considered population trends, traffic trends, and major transportation routes. The site was adjacent to a major thoroughfare, it had excellent exposure, and would be attractive to a major tenant for multitenant occupancy. Karth opined that the highest and best use of the property, as of March 8, 1989, was office use.

In determining value, Karth applied the sales or market approach, which takes into account sales of comparable properties. Karth considered numerous sales in the area before reaching his conclusion that the subject site had a value of $1,240,000. The entire amount was allocated to the portion taken and zero to the remainder because there was nothing that could be done with it. In particular, Karth utilized the Marriott sale, a neighboring hotel property, and the Agitron sale as bases for his comparison. Karth adjusted the value to $7 per square foot, after taking into account that the subject site was located partially in a floodplain. Karth further testified that the 45,000-square-foot building proposed by Stoetzel was consistent with the highest and best use of the property, but other potential uses were possible.

Marshall Skibbe, a licensed civil engineer, testified that he had previously engineered projects located within floodplains. Based upon his previous engineering experience with the property, Skibbe opined that an office and parking garage could have been built on the subject site. Skibbe based his opinion, in part, on his experience with the Motorola building, which was located to the south of the subject site, and the Freightliner project, also located near the subject site, both of which entailed the filling in of portions of the Salt Creek floodplain and the design of a basin for the storage of storm water.

Skibbe further testified that he designed the retention basin on the subject site. He determined that there was excess capacity in the basin, which meant that a building larger than the one proposed by Stoetzel could have been constructed. Skibbe later testified that if all the excess capacity storage were reclaimed a building footprint of approximately 28,000 square feet was possible. Therefore, under the terms of a local ordinance, a four-story building with a square footage in excess of 100,000 feet was possible. On cross-examination, Skibbe

stated that he was not a wetlands engineer, but he knew that the property, as of March 8, 1989, was not a jurisdictional wetland.

Frederick Barofsky, a real estate developer and building manager, testified that he considers six factors when evaluating a site: marketability, usability, developability, findability, accessibility, and visibility. Applying the six factors to the subject site, Barofsky stated that the site was in an excellent market. Although he had some concerns about the floodplain, floodway, and assuring himself that the property was not a wetland, Barofsky felt that the issues could be resolved, thus making the site usable. He later stated that usability was what made the subject site a "tough" site. Developability, which takes into consideration zoning and community attitude, was very good if not excellent, and the subject site additionally met his criteria of findability, accessibility, and visibility because of its location on Thorndale Road near Interstate 355. Barofsky further stated that he had previously worked on two projects located within floodplains. He further opined that it would be feasible to construct a substantial office site on the subject site.

On cross-examination, Barofsky stated that in his analysis he believed that the property within the detention basin was not a jurisdictional wetland under the Corps' jurisdiction. Barofsky admitted that his opinion would be impacted if the property had been classified as a jurisdictional wetland.

Theodore Kowalski, a real estate appraiser and consultant, testified that he was hired in 1988 by DOT to appraise the subject site. Kowalski testified that he had previous experience appraising properties located within floodplains. In arriving at his opinion of value of the subject property, Kowalski researched his files to arrive at a value based upon comparable sales in the area. He subsequently inspected the site, compiled additional data, conferred with village officials, and spoke with the property owner and his engineers.

The trend and development in the area were towards modern developed offices, corporate headquarters, and industrial properties. Kowalski opined that the highest and best use of the subject site was for office development. In reaching his opinion, Kowalski considered such factors as the site's frontage location, the presence of a stoplight intersection, the market trend in the area, zoning, and density. Based upon his research, Kowalski stated that a building in the range of 100,000 to 150,000 square feet could be built on the subject site. Kowalski further opined that the entire 7.5-acre parcel had a fair cash market value of $1,287,500. To arrive at that figure, Kowalski based his analysis on 206,000 square feet and applied a unit value of $6.25

per square foot. Kowalski assigned a value of $1,008,700 to the part taken, thus attributing $278,800 to the remainder before the taking. Adjusting for damages to the remainder, the final value (*i.e.*, the amount to be paid to the property owner) was $1,159,700.

On cross-examination, Kowalski admitted that he believed the property to be a man-made wetland and that the owner of the property did it temporarily to store water. Kowalski was also impeached by a statement he gave during his deposition, wherein he admitted that he was referring to a jurisdictional wetland when he referred to the retention basin. Kowalski subsequently stated that to his knowledge the subject site was not a jurisdictional wetland and that the property was not on the wetlands map. If the property were wetlands, however, Kowalski would have to rethink his entire evaluation.

PLAINTIFF'S CASE IN CHIEF

Christopher Burke, a civil and water resources environmental engineer, testified that he and his company have been involved in approximately 300 wetlands-related projects over the past five years and that his firm is the floodplain and wetland review engineer for the City of Wood Dale. Burke stated that his firm was the prime consultant for the preliminary engineering, permitting, final engineering, and construction observation for the Wood Dale-Itasca flood control project. Burke further testified about his extensive experience working with private and public entities regarding water management issues.

Burke stated that in order to qualify as a wetland, the property in question has to have the necessary water, which can occur from water draining into it or onto it, and wetland-type plants, *e.g.*, bulrushes and cattails. Burke further testified that he investigated the subject site in the fall of 1989 in connection with his work on the Wood Dale-Itasca flood control project. Based upon information obtained from his client, Burke's engineers determined in fall of 1989 that the retention pond on the subject site was a mitigated wetland. Burke explained that a mitigated wetland arises in the circumstance where a developer fills in a jurisdictional wetland area, thus necessitating it to take an area that was not already wetland and make it into one.

In formulating his opinions about the subject site, Burke personally visited the site and collected soil and hydrologic data and information about groundwater. Additionally, he reviewed aerial photographs for historical perspective. Burke opined that as of March 8, 1989, there was nothing temporary about the detention basin on the subject site. When asked whether any part of the subject was a jurisdictional wetland as of March 8, 1989, Burke responded affirmatively.

He further stated that jurisdictional wetlands were not solely distinguished based upon whether they were man-made or natural.

Burke also acknowledged his familiarity with the draft EIS and stated that he was aware that it did not depict the detention basin as a jurisdictional wetland. This fact did not change his opinion, however, because: (1) the draft EIS was prepared utilizing methodology that "superseded" the date of valuation; (2) the draft EIS was developed using aerial photographs that did not show the existence of the pond; and (3) other man-made ponds existed in the area which were classified as jurisdictional wetlands. Burke opined that as of March 8, 1989, it would not be possible to obtain all of the required permits necessary for a substantial development requiring less than one acre of filling and no wetland mitigation. Burke further acknowledged that the final EIS, prepared in 1990, and the final design report, entitled "FAP 426 Elgin-O'Hare Expressway," did not delineate the retention basin as a jurisdictional wetland.

On redirect examination, Burke explained how the draft and final version of the EIS and the design report were prepared. A consultant was hired by DOT to compile the EIS. As part of its study, the consultant performed traffic counts and a tree survey and conducted a field investigation in 1986. Additionally, the consultant reviewed aerial photographs, which did not show the existence of the retention pond. In sum, according to Burke, the site in 1986 did not appear as it did in 1989.

Burke further explained that when the EIS was compiled DOT was uncertain as to the final alignment of the expressway; therefore, it was not concerned with "fine tuning the wetland delineation." Further, if DOT were going to perform work in the area in 1989, a permit from the Corps would have been required. Burke stressed that prior to developing the subject site a wetland determination would have been required regardless of whether it were delineated as such on a wetland map. Finally, Burke stated that the national wetlands inventory map and the draft and final EIS served only as "large-scale guides."

Allen Kracower, an urban planner, zoning consultant, and landscape architect, testified that he first became familiar with the subject property early in 1991. In order to acquaint himself with the property, Kracower reviewed various public documents, including the annexation agreement, environmental studies, a special use ordinance, engineering documents, the city's comprehensive plan, and the plat of subdivision on file. Additionally, he visited the property on several occasions and walked around it at least twice.

In reaching his opinion regarding the highest and best use of the property, Kracower considered a number of factors: documentary research, including the comprehensive plan of Wood Dale and the special use ordinance; personal experience and training; inspection of the site and its physical characteristics; the natural resource constraints; the location of floodways and floodplains; photographs; and environmental data he received from Burke. Kracower further described the physical characteristics of the property as unique and unusually configured because of its flagpole shape. He further found it significant that the eastern side of the property was depressed in the form of a detention pond and that, according to his measurements, approximately 50% of the property was floodway, which meant that it could not be developed.

In addition to another environmental study, Kracower relied on an environmental study prepared by Burke, which found that the detention pond was wetland. Kracower opined, in his capacity as an urban land planner, that the subject property was constrained with significant environmental problems. He ultimately concluded that in consideration of "all the hurdles, especially with the approval of wetlands," it would be very difficult to accomplish an office or industrial development. On cross-examination, Kracower stated that the remainder of the property could not be developed after the taking by DOT.

Neil King, a real estate broker, appraiser, and counselor, testified that he had previously valued properties with floodplains and wetlands present. He further testified that the presence of floodplains or wetlands affects the value of a given property. King viewed the property, reviewed the zoning ordinance, the highway plat map, sewer and water maps for Wood Dale, floodplain maps, drawings prepared by Burke and Kracower, and aerial photographs. He also reviewed, among other things, parking structure costs that were prepared on behalf of the property owner, the title insurance policy, comparable offerings, and the special use permit.

In determining the highest and best use of the subject site, as of March 8, 1989, King considered the size of the property, the physical characteristics of the property, the fact that most of the property was located in floodplain or wetland, and the rectangular part (i.e., the pennant), which was the most suitable for building, happened to have a detention pond that was a wetland. King also considered the trend of development in the area, zoning, contiguity to Salt Creek, the fact that Forest Creek is primarily an industrial park, and that there had been a particular ordinance enacted by the city permitting a particular building.

In conjunction with the construction of a building, King further considered some extraordinary costs: the necessity of having to run sewer and water lines to the proposed building, landfilling, and the construction of a retaining wall. Additionally, the building would not have the visual identity that office users typically desire. In order to reach the building it would be necessary to come around the corner from the end of a cul-de-sac.

King further considered that there were very few office buildings on Thorndale Avenue and that a large development nearby, which was unburdened by an expensive parking structure, wetlands, or extraordinary sewer and water costs, was only 63% occupied on the valuation date (March 8, 1989). King stated that an office building would have been economically "unfeasible [sic]."

King opined that the highest and best use of the subject site, when he first looked at it, seemed to be for its continuation as a detention basin. King stated, however, that he was somewhat swayed by the fact that the city permitted a 15,000- or 16,000-square-foot pad, which would allow the property owner's 45,000-square-foot theoretical office building with the tiers of the parking structure in the flood fringe. With the aid of Kracower and Burke, King determined, using the same amount of fill required for Stoetzel's proposed building, it would be possible to construct an approximately 8,000-square-foot, one-story industrial building with parking on grade or a 5,500-square-foot, one-story office building. King's determination presumed that the city would permit the same kind of filling as originally permitted relative to Stoetzel's proposed building.

King opined that the value of the entire property, as of March 8, 1989, was $80,000. He valued the part taken at $39,536, which he arrived at by dividing 7.5 acres into $80,000 and then multiplying the resulting per-square-foot value ($0.245) times the acreage taken (3.7 acres). King assigned no damages to the remainder because the amount of usable land remained the same. On cross-examination, King stated that he determined the amount of buildable square footage from calculations he had received from Burke and Kracower.

Following King's testimony, defendants moved to strike Burke's testimony on the grounds that it was improper for him to offer an opinion that the subject site was a jurisdictional wetland, when, in fact, the Corps did not consider it as such on the date of valuation. The trial court denied defendants' motion, reasoning that whether the site was a jurisdictional wetland was a question for the jury to resolve.

Richard Roddewig, a real estate consultant and appraiser, testified that, in reaching his opinion about the highest and best use of the subject site, he first considered the physical constraints. According to the maps, the most prevalent physical constraint was that approximately 90% of the site was located in either a floodway or flood fringe. Additionally, there was an area at the northeast corner of the entire property that had a cattail marsh.

Roddewig further considered the "legal permissibility" which took into account the existing zoning, the annexation agreement, and the declaration of covenants. He considered the subject site to have very limited financial feasibility. Vacancy rates for office space were up, thus limiting financing available for development, especially for speculative office development. Roddewig concluded that the highest and best use of the property would be development of either a 5,000-square-foot office building or a one-story 8,000-square-foot warehouse or industrial building.

Roddewig further opined that Stoetzel's proposed building, as of March 8, 1989, was infeasible for two reasons. First, parking decks are only constructed as a necessity because "you can't get enough rent to offset the cost." Additionally, there are extra costs, and not all people consider it an amenity.

Roddewig further testified that buyers and sellers are very concerned about the usable area of properties that are affected by floodplains or by wetland considerations. He also stated that a reasonably prudent and knowledgeable buyer would be "crazy" not to investigate for the presence of jurisdictional wetlands. Roddewig opined that the value of the entire property was $165,000 and that the value of the subject site was $81,000.

On redirect examination, Roddewig was specifically asked whether his opinion of value would differ if it were concluded that there were no jurisdictional wetlands on the property. Roddewig responded in the negative and explained that the problems with the fill applied to the detention pond and not whether it was classified a jurisdictional wetland.

Plaintiff's final witness was James Dunn, a real estate agent and broker. Dunn opined that the highest and best use for the property was for a water retention basin. In support of his opinion, Dunn considered the zoning, the location of the property along the Salt Creek, the covenants and restrictions, the topography, and that sewer and water were possibly 600 feet away. He valued the entire property, as of March 8, 1989, at $332,570, taking into consideration the factors enumerated and eight sales of other properties in the area. Dunn fur-

ther opined that the value of the part taken was $161,390, with no damages to the remainder. Dunn stated that although no broad market for wetlands exists, various State agencies can and do purchase wetlands. Therefore, it was his opinion, in light of the location and the State's willingness to purchase, that the wetlands had a value of $1 per square foot.

The jury returned a verdict in the amount of $161,390, and the trial court subsequently entered judgment thereon. Defendants' posttrial motion was denied, and this appeal followed.

OPINION

Defendants' first contention is that the trial court erred in denying its motion *in limine* and motion to strike, which sought to exclude the opinion testimony of plaintiff's witnesses regarding the status of the subject site as a jurisdictional wetland. Defendants initially argue that Burke's opinion regarding the character of the subject site and certain infirmities underlying the environmental impact statements and final design report was irrelevant because it was contrary to the Corps' earlier determination that the subject site was not a jurisdictional wetland. Plaintiff responds, in part, that the jury could not rely on the environmental impact statements (and the final design report) as sole determinants regarding whether there were jurisdictional wetlands located on the subject site because the jury was required to determine the fair cash market value as of the valuation date, March 8, 1989. Accordingly, Burke's testimony was necessary to bring the facts up to date, thus providing the jury with an accurate basis upon which to value the subject site.

The law of eminent domain provides that the owner of property condemned for public use is entitled to just compensation measured by the fair market value of the property at its highest and best use. (*Department of Public Works & Buildings v. Association of Franciscan Fathers* (1977), 69 Ill. 2d 308, 314.) In an eminent domain proceeding, the only issue for jury resolution is to determine the just compensation to be paid to the owner of the property sought to be condemned. (*City of Chicago v. Anthony* (1990), 136 Ill. 2d 169, 174; *Sanitary District v. Johnson* (1931), 343 Ill. 11, 16.) Just compensation is the fair cash market value of the subject property at its highest and best use to be determined as of the date of the filing of the complaint to condemn. (*Anthony*, 136 Ill. 2d at 174.) "[T]he fair cash market value *** shall be the amount of money which a purchaser, willing but not obligated to buy the property, would pay to an owner

willing but not obliged to sell in a voluntary sale \*\*\*." 735 ILCS 5/7—121 (West 1992).

> "The highest and best use may be the present use to which the property is actually put or:
>
>> 'any capacity for future use which may be anticipated with reasonable certainty, though dependent upon circumstances which may possibly never occur, \*\*\* if it in fact enhanced the market value of the land in its present condition and state of improvement. The future prospective use affecting value must be a present capacity for a use which may be anticipated with reasonable certainty and made the basis of an intelligent estimate of value.' *Crystal Lake Park District v. Consumers Co.* (1924), 313 Ill. 395, 406." *Anthony*, 136 Ill. 2d at 174-75.

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. (*People v. Boclair* (1989), 129 Ill. 2d 458, 477; *People v. Monroe* (1977), 66 Ill. 2d 317, 322.) The fact to be proved may be ultimate, intermediary or evidentiary, so long as it is of consequence in the determination of the action. (Fed. R. Evid. 401, Advisory Committee's Note.) A fact of consequence describes a proposition that exists within the case (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §401.1, at 128 (5th ed. 1990)), and whether a fact is of consequence is determined by the substantive law governing the case (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §401.1, at 128 (5th ed. 1990); accord *Anthony*, 136 Ill. 2d at 187 (in an eminent domain proceeding "it is eminent domain law which controls the admissibility of evidence for its truth")).

■ Based upon the foregoing, we determine that the trial court did not err in allowing Burke's testimony because it was relevant to the determinative issue of the fair cash market value of the subject site on the date the petition to condemn was filed. Precise determination of the amount a willing buyer would pay to a willing seller on the petition filing date required the trier of fact to be equipped with those facts necessary to reach a fully informed decision. Contrary to defendants' assertion, we find no basis, and defendant cites no authority, upon which to exclude plaintiff's evidence regarding the wetland status of the subject site solely because the Corps had earlier participated as a cooperating agency in compiling the draft and final environmental impact statements. Additionally, Slowinski's testimony that the Corps could order a landowner to cease and desist until obtaining

a permit, which necessarily contemplates a wetland determination, undermines defendants' contention that the Corps' determination in conjunction with the promulgation of an environmental impact statement dispositively and solely determined the wetland status of the property until a subsequent determination was made.

Rather than considering it to be a dispositive determination, we view the wetland delineations depicted in the environmental impact statements as evidence that the jury could accept or reject in reaching its determination of just compensation. Moreover, to exclude Burke's testimony regarding the wetland character of the subject site (*i.e.*, construction of the retention basin), which revealed changed factual circumstances when compared with the data relied upon for the compilation of the draft and final environmental statements, would have deprived the jury of an accurate representation of the true physical state of the subject site on the valuation date. Accordingly, Burke's testimony regarding the wetland character of the subject site and plaintiff's valuation experts' reliance thereon was legally relevant, notwithstanding the Corps' earlier wetland determinations in the environmental impact statements.

Defendants next argue that plaintiff's witnesses' testimony that the subject site was unusable because of the presence of jurisdictional wetlands should have been barred under *City of Chicago v. Anthony* (1990), 136 Ill. 2d 169. In *Anthony* the supreme court, in an eminent domain proceeding, affirmed the trial court's exclusion of expert valuation testimony which referred to the dollar amount of income contained in a sign lease proposal and testimony about rental income received from sign lease agreements on other properties. The court expressed its agreement with the principle that Federal Rules of Evidence 703 and 705, as adopted in *Wilson v. Clark* (1981), 84 Ill. 2d 186, applied to qualified expert witness testimony in eminent domain proceedings. The court noted, however, that the application of Federal Rules 703 and 705 was not intended to " 'guarantee the admissibility of all expert testimony that meets its criteria if such testimony runs afoul of other evidentiary requirements.' " (*Anthony*, 136 Ill. 2d at 186, quoting *Barrel of Fun, Inc. v. State Farm Fire & Casualty Co.* (5th Cir. 1984), 739 F.2d 1028, 1033.) Accordingly, "in order for facts or data to be reasonably relied upon by an expert in reaching an opinion of the fair cash market value of the property sought to be condemned, the facts or data must be legally relevant." *Anthony*, 136 Ill. 2d at 190.

In the present case, defendants argue that because DOT's valuation experts' opinions were premised upon Burke's legally irrele-

vant conclusions, the trial court erred in failing to exclude their testimony. Defendants' argument is without merit because it assumes the validity of their earlier contention that Burke's testimony about the presence of jurisdictional wetlands was legally irrelevant, which we have determined to be otherwise. Accordingly, the general principle espoused in *Anthony*, with which we agree, is inapposite. Defendants do not otherwise contest that the facts and data contained within Burke's opinion would not be of a type reasonably relied upon by experts in the particular fields of plaintiff's experts. Accordingly, the trial court did not err in allowing plaintiff's valuation witnesses to testify that they considered Burke's conclusions about the wetland status of the subject property in reaching their conclusions as to the fair cash market value of the subject site.

Moreover, there is some evidence in the record to suggest that at least one of plaintiff's experts would have reached the same conclusion independently of Burke's determination that the subject site was burdened with wetlands. Richard Roddewig testified unequivocally that his opinion of value would not have differed if it were concluded that there were no jurisdictional wetlands on the property.

Defendants finally argue that plaintiff is barred under the doctrine of equitable estoppel from asserting that the subject site was a jurisdictional wetland. Defendants maintain that because plaintiff participated as a cooperating agency in the preparation of the draft and final environmental impact statements, wherein the subject site is not depicted as a jurisdictional wetland, plaintiff should be estopped from now asserting that the property meets the criteria of a jurisdictional wetland for the purpose of establishing the fair cash market value of the subject site.

Equitable estoppel applies against the State only when there are some positive acts by State officials which may have induced the action of the adverse party under circumstances where it would be inequitable to render that party's actions futile or ineffectual by allowing the State to rescind what it had previously performed. (*Jack Bradley, Inc. v. Department of Employment Security* (1991), 146 Ill. 2d 61, 81; *Board of Trustees of the Addison Fire Protection District No. 1 Pension Fund v. Stamp* (1993), 241 Ill. App. 3d 873, 879.) Its purpose is to prevent a party from asserting rights where the assertion of those rights would work a fraud or injustice. *Stamp*, 241 Ill. App. 3d at 879.

The positive act asserted by defendants is the publication of the draft and final environmental impact statements. Defendants, however, failed to present any evidence at trial which would support

the conclusion that the publication of those documents induced them to act under circumstances where it would be inequitable to allow defendants' actions to be rendered futile or ineffectual.

Defendants further maintain that plaintiff's actions were tantamount to misrepresentation. Contrary to defendants' contention, we do not view plaintiff's actions as an attempt to misrepresent the nature of the subject site for the sole purpose of reducing the valuation. Rather, plaintiff's difference in position was the result of events subsequent to the consultant's study upon which the environmental statements were premised. Defendants did not dispute or otherwise contradict Burke's testimony that the environmental reports were predicated upon information and data gathered prior to the construction of the retention basin. Additionally, Lannert's admission that the property was burdened with man-made wetlands on the valuation date further diminished the efficacy of defendants' theory of misrepresentation. Furthermore, defendants submitted no evidence that they took any action in reliance on either environmental statement, and they do not dispute plaintiff's contention that the building permit for the retention basin was obtained prior to the publication of the draft environmental statement. Accordingly, under the circumstances of this case, we perceive no inequity tantamount to a fraud or injustice necessitating the application of the doctrine of equitable estoppel.

■ Defendants' final contention on appeal is that the jury verdict awarding them $161,390 was against the manifest weight of the evidence. Defendants argue that plaintiff's valuation experts' opinions were improperly predicated upon Burke's testimony regarding jurisdictional wetlands, thus rendering the jury's verdict against the manifest weight of the evidence. Defendants' argument assumes the validity of their contention that Burke's testimony was inadmissible, which we have determined to be otherwise. Accordingly, based upon our review of the entire record, our analysis above, and because the jury verdict fell within the range of values testified to by the parties' valuation experts, we conclude that the jury verdict was not against the manifest weight of the evidence. See *Illinois State Toll Highway Authority v. American National Bank & Trust Co.* (1992), 236 Ill. App. 3d 696, 704.

For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

INGLIS, P.J., and COLWELL, J., concur.